# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: July 9, 2026

| | | |
|---|---|---|
| MARY MOON, Petitioner, | | PUBLISHED |
| | | No. 18-1403V |
| v. | | Special Master Nora Beth Dorsey |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | | Dismissal; Influenza ("Flu") Vaccine; Herpes Encephalitis. |

Renee J. Gentry, Vaccine Injury Clinic, George Washington Univ. Law School, for Petitioner.
Dorian Hurley, U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION**[1]

On September 14, 2018, Mary Moon ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Petitioner alleges that an influenza ("flu") vaccination administered to her on September 22, 2015 "was the cause-in-fact" of her encephalitis, or in the alternative, significantly aggravated her asymptomatic Herpesviridae, causing herpes simplex

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018) ("Vaccine Act" or "the Act"). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C.A. § 300aa.

virus ("HSV")-1 encephalitis.[3] Petition at Preamble, ¶ 6 (ECF No. 1); Petitioner's Post-Hearing Brief ("Pet. Post-Hearing Br."), filed Nov. 13, 2023 (ECF No. 60). Respondent argued against compensation, stating that "this case is not appropriate for compensation under the terms of the [Vaccine] Act." Respondent's Report ("Resp. Rept.") at 1 (ECF No. 15).

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards,[4] the undersigned finds that Petitioner has failed to provide preponderant evidence that her flu vaccine caused her HSV-1 encephalitis or significantly aggravated her HSV, causing HSV-1 encephalitis, and thus has not satisfied her burden of proof under Althen v. Secretary of Health & Human Services, 418 F.3d 1274, 1280 (Fed. Cir. 2005) and Loving v. Secretary of Health & Human Services, 86 Fed. Cl. 135, 142-44 (2009). Accordingly, Petitioner is not entitled to compensation.

## I. ISSUES TO BE DECIDED

The parties stipulate that at some point prior to Petitioner's flu vaccination on September 22, 2015, she had contracted HSV. Joint Pre-Hearing Submission ("Joint Submission"), filed Aug. 17, 2023, at 1 (ECF No. 53). The parties also stipulate that the appropriate diagnosis for Petitioner is herpes encephalitis. Id. The parties also agree that reactivation of HSV can lead to encephalitis. See Pet. Exhibit ("Ex.") 8 at 9 ("HSV-1 may reactivate either in the peripheral nervous system or within the central nervous system and rarely lead to a productive infection in the brain termed 'herpes encephalitis.'"); Transcript ("Tr.") 148-50 (Dr. Leist testifying "if we are talking about herpes encephalitis, we are talking about [HSV]-1. It's very often [due to] reactivation into the central nervous system . . . .").

However, the parties dispute when Petitioner's HSV reactivation began and whether Petitioner's current condition constitutes a "significant aggravation" of her condition prior to vaccination, pursuant to the Loving analysis. Joint Submission at 2. Finally, the parties dispute if the flu vaccination Petitioner received can cause or significantly aggravate an HSV reactivation, leading to HSV encephalitis, in accordance with the Loving and Althen analysis. Id.

---

[3] For clarity and simplicity, the undersigned will use HSV as the abbreviation for "herpes simplex virus" type one (HSV-1) throughout this Decision. Thus, where the records or expert reports reference HSV-1, the undersigned will use the abbreviation HSV unless HSV-1 is needed for context.

[4] While the undersigned has reviewed all of the information filed in this case, only those filings and records that are most relevant will be discussed. See Moriarty v. Sec'y of Health & Hum. Servs., 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision."); see also Paterek v. Sec'y of Health & Hum. Servs., 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

## II. BACKGROUND

### A. Procedural History

On September 14, 2018, Petitioner filed her petition, followed by medical records on October 21, 2018.[5] Petition; Pet. Exs. 1-6. Respondent filed his Rule 4(c) report on August 21, 2019, arguing against compensation. Resp. Rept. at 1.

Petitioner filed an expert report from Dr. Carlo Tornatore on August 4, 2020 and Respondent filed an expert report from Dr. Thomas Leist on November 5, 2020. Pet. Ex. 8; Resp. Ex. A. The parties filed supplemental expert reports from July 26, 2021 to October 28, 2021. Pet. Ex. 17; Resp. Ex. G.

An entitlement hearing was held on August 23, 2023 before a different special master. Hearing Order dated Feb. 9, 2023 (ECF No. 44); Order dated Aug. 20, 2023 (ECF No. 56). The parties filed post-hearing briefs from November 13, 2023 through February 28, 2024. Pet. Post-Hearing Br.; Resp. Post-Hearing Br., filed Dec. 28, 2023 (ECF No. 61); Pet. Reply to Resp. Post-Hearing Br. ("Pet. Reply Br."), filed Feb. 28, 2024 (ECF No. 62).

This case was transferred to the undersigned's docket on March 4, 2026. Notice of Reassignment dated Mar. 4, 2026 (ECF No. 66). The undersigned held a status conference with the parties on March 10, 2026, and ordered the parties to file a status report indicating their respective positions. Order dated Mar. 10, 2026 (ECF No. 67). Respondent filed a status report on April 27, 2026 indicating that he wished to continue to defend the case. Resp. Status Rept., filed Apr. 27, 2026 (ECF No. 72).

Accordingly, this matter is now ripe for adjudication.

### B. Factual History

#### 1. Stipulated Facts

The parties agreed to the following stipulated facts in their Joint Prehearing Submission. See Joint Submission at 1.

Petitioner was born on January 20, 1947. Joint Submission at 1. Petitioner received the Fluzone flu vaccination on September 22, 2015. Id. At some point prior to her September 22, 2015 flu vaccination, Petitioner had contracted HSV. Id. Lastly, they agree that Petitioner's diagnosis is herpes encephalitis. Id.

---

[5] Medical records were filed throughout the pendency of the claim.

### 2. Summary of Medical Records[6]

Prior to receiving the flu vaccine on September 22, 2015, Petitioner had history of radiculopathy, hypertension, and congestive heart disease. Pet. Ex. 3 at 32, 77, 213; Pet. Ex. 6 at 4. She was 68-years old when she received the flu vaccine at Tom Thumb Food and Pharmacy on September 22, 2015. Pet. Ex. 1 at 1. The following morning, on September 23, 2015, Petitioner began to feel sick with generalized malaise, without any fevers, chills, nausea, or vomiting. Pet. Ex. 6 at 7. Petitioner had facial droop and numbness, and she was unable to use her right hand while taking a shower. Id. After the shower, Petitioner's facial droop became more prominent, she was having difficulty with speech, and experienced "right arm paralysis." Id.

Petitioner was brought to the emergency department of Methodist Charleton Medical Center ("MCMC"), where she was treated with tissue plasminogen activator ("TPA") for a possible left middle cerebral artery stroke. Pet. Ex. 6 at 6-8. A brain computed tomography ("CT") showed "implied cerebral atrophy," but was otherwise normal. Id. at 8. Petitioner's facial droop initially improved but then returned and she continued to have difficulty finding words. Id. at 7.

Petitioner was admitted to MCMC for observation and continued treatment for a possible acute ischemic cerebrovascular incident. Pet. Ex. 6 at 8-9. During her admission, Petitioner developed a fever of 100.2º Fahrenheit and continued to exhibit speech difficulties. Id. at 11. Her assessment considered the flu vaccine she received the day before, but the treating physician opined, "History is less suggestive of post-vaccination encephalitis, but will monitor closely." Id. A brain magnetic resonance imaging ("MRI") revealed "mild scattered cerebral white matter T2 hyperintense signal changes" in a nonspecific pattern and "diffusion restriction consistent with recent ischemia involving the left insular and left posterior frontal cortex," along with "associated edema-like signal." Id. at 81.

On September 26, 2015, Petitioner's neurological status progressively worsened, and she had developed a high fever. Pet. Ex. 6 at 13-14. Infectious disease physician, Dr. Nebu Alexander was consulted to determine if a lumbar puncture was necessary, and stated:

> A high-grade fever in a patient with stroke. The timing of the flu shot and her symptoms was quite impressive. It certainly could be vaccine induced encephalitis but that is very rare, however, that does not explain the stroke symptoms. Other possibilities include a viral encephalitis, especially [HSV] and West Nile virus. She is developing a pneumonia as well. Hence, I would target antibiotics for that. My suggestions would be we should consider doing a lumbar puncture. I would suggest [interventional radiology] to do that. Send cerebral spinal fluid studies for [HSV] as well as West Nile virus.

---

[6] The summary of medical records is largely taken from the Respondent's Rule 4(c) and parties prehearing briefs, as the undersigned finds they provide an accurate representation of the records. See Pet. Br. at 2-6; Resp. Rept. at 2-4. The summary has been edited by the undersigned.

Id. at 14 (emphasis added). Petitioner's cerebrospinal fluid ("CSF") was positive for Herpes Virus 1 DNA. Id. at 62. As her condition worsened, she was transferred to Baylor University Medical Center on September 27, 2015. Pet. Ex. 6 at 4; Pet. Ex. 3 at 6592.

Petitioner was admitted to Baylor University Medical Center with "viral encephalitis" and "probable prior stroke" as the admitting diagnoses. Pet. Ex. 3 at 7804. Infectious disease physician, Dr. Clinton Haley reviewed Petitioner's MRI and opined that it was "most consistent with HSV encephalitis." Id. at 6597. That same day, on September 28, 2015, neurologist Dr. Sadat Shamim reviewed Petitioner's history and provided, "Working diagnosis is meningoencephalitis either due to viral infection such as HSV or due to vaccine reaction." Id. at 6602. Petitioner was treated with Acyclovir intravenously for five weeks. Id. On October 2, 2015, infectious disease physician, Dr. Haley assessed Petitioner with HSV encephalitis and explained that Petitioner's "ongoing fever [was] not surprising," and that she would need 21 days of intravenous Acyclovir. Id. at 6659.

Petitioner had a prolonged hospitalization complicated by obtundation, respiratory failure, aspirational pneumonia, seizures, anemia, and inferior vena cava thrombosis. See Pet. Ex. 3 at 7800-02. Her diagnosis of HSV encephalitis remained throughout her treatment at Baylor Hospital. See, e.g., id. at 6819 (October 11, 2015 repeat brain MRI consistent with HSV encephalitis), 6859 (October 13, 2015 infectious disease assessment of HSV encephalitis), 6958 (October 19, 2015 infectious disease progress note indicating repeat lumbar puncture results were consistent with clinical picture and poor prognosis and assessment was HSV encephalitis).

Petitioner was discharged on November 11, 2015 to a long-term acute care hospital. Pet. Ex. 3 at 7800. The discharge summary provided a detailed description of her hospital course and noted that while she was admitted to Baylor, "her HSV PCR from outside hospital came back as positive and therefore it was confirmed that this patient had viral encephalitis causing her symptoms." Id.

Petitioner underwent brain injury rehabilitation and was later moved in and out of several assisted living facilities. See Pet. Ex. 4 at 1; see also Pet. Ex. 7 at 3-6; see generally Pet. Exs. 16, 20. On January 5, 2018, Petitioner underwent a neuropsychological evaluation where she demonstrated significant cognitive impairments that were "consistent with generalized encephalopathy." Pet. Ex. 4 at 2. The diagnostic impression was "encephalitis due to herpesviridae; dementia associated with herpes encephalitis; epilepsy without status epilepticus." Id. at 3.

Petitioner was treated for various health complications following her encephalitis hospitalization from 2019 through 2022. See Pet. Ex. 21 at 15 (admitted to Baylor University Medical Center for a neurologic problem from October 1-4, 2019); Pet. Ex. 22 at 31 (treated at Medical City Plano for a minor fall). Petitioner was moved into a memory care facility on July 1, 2020, where she has remained. Pet. Ex. 20.

No additional medical records have been filed.

### 3. Hearing Testimony and Affidavits of Mrs. Susan Spackey[7]

Petitioner's daughter, Mrs. Susan Spackey, stated that her mother (Petitioner) was an active 68-year old woman who managed an online children's clothing, costume, and accessories boutique and managed a beach house property. Pet. Ex. 7 at ¶ 2. Petitioner was actively involved in the lives of her eight grandchildren, attending school functions, football games, and dance recitals. Tr. 6.

Prior to receiving the flu vaccine on September 22, 2015, Petitioner was a volunteer for Meals on Wheels and was the treasurer of the Mothers Club at her former high school. Tr. 7. Petitioner was also actively involved in managing her husband's health, who had early signs on dementia. Id.

The weekend prior to receiving the flu vaccine, Petitioner had spent the weekend with Mrs. Spackey to attend her grandchildren's football game. Tr. 8. Mrs. Spackey described Petitioner as "great." Id. The evening of Petitioner's flu vaccination, September 22, 2015, Petitioner went to bed early without dinner. Tr. 9. Mrs. Spackey testified that Petitioner texted her on the morning of September 23, 2015 that she "don't feel good." Tr. 17. When Petitioner woke up, she had a low-grade fever and body aches. Id. Mrs. Spackey testified that Petitioner "moved to the couch, and she pretty much stayed there, which was kind of unusual for her to be on the couch like that." Id. Then Petitioner texted her sister, Mrs. Spackey's aunt, "Help," and "need you." Id.; Pet. Ex. 7 at ¶ 5. Petitioner took a shower around 3:00 p.m., got into bed, and "she wasn't really talking about this point," and she nodded when her husband asked if he should call 9-1-1. Tr. 9.

Mrs. Spackey testified that Petitioner's presenting symptoms were fever, confusion, slurred speech, and right-sided weakness. Tr. 10. Mrs. Spackey arrived at the hospital around 10:00 p.m., and Petitioner was already admitted to the intensive care unit ("ICU") of MCMC. Id. Mrs. Spackey testified that when she saw Petitioner, her mother, Petitioner called her by a different name. Id. Over the next couple of days, Petitioner's condition deteriorated and she had increased confusion. Id.; Pet. Ex. 7 at ¶¶ 8-9. After four days at MCMC, Petitioner was transferred to Baylor University Hospital where she was admitted to the Neurological ICU for 90 days. Pet. Ex. 7 at ¶ 3.

After Petitioner's initial ICU care, she did not recognize her husband or children. Pet. Ex. 7 at ¶ 15. Petitioner moved 12 times since her initial hospitalization, going from long-term acute care, skilled nursing, inpatient rehab, and a final move to a memory care facility. Tr. 11. Petitioner requires 24-hour monitoring and is unable to care for herself. Id.; Pet. Ex. 7 at ¶ 16.

Mrs. Spackey described her mother as an amazing woman who loved life, and was the family "compass." Tr. 15. The impact of Petitioner's injury has devastated the family. Pet. Ex. 7 at ¶ 38. Petitioner has lost her independence, and has caused considerable emotional stress on the family and Mrs. Spackey. Id.

---

[7] Mrs. Spackey is Petitioner's daughter and provided one affidavit. Pet. Ex. 7.

### C. Expert Opinions

#### 1. Petitioner's Expert, Dr. Carlo Tornatore[8]

##### a. Background and Qualifications

Dr. Tornatore is board-certified in neurology and psychiatry, is the Chairman of the Department of Neurology at Georgetown University Medical Center, and is the Neurologist-in-Chief of the Department of Neurology at Medstar Georgetown University Hospital in Washington, D.C. Pet. Ex. 8 at 1; Pet. Ex. 30 at 1. He received his B.A. from Cornell University and his M.D. from Georgetown University School of Medicine in 1986. Pet. Ex. 30 at 1. Thereafter, he completed an internal medicine internship and residency in neurology at Georgetown University Hospital. Id. at 2. Dr. Tornatore has taught at Georgetown University Medical Center since 1990, and became the Chairman of the Neurology Department in 2015. Id. As Chairman, he oversees research projects and 15 laboratories focused on neuroscience, including neuroplasticity, neuroimaging, cognitive neuroscience, and language disorders. Pet. Ex. 8 at 1. Additionally, Dr. Tornatore has overseen the Multiple Sclerosis ("MS") Center at Georgetown University Medical Center, which cares for MS patients and engages in clinical trials for the treatment of different forms of MS. Id. at 2. The MS clinic also treats and follows 221 patients with acute disseminated encephalomyelitis ("ADEM"), neuromyelitis optica ("NMO"), transverse myelitis ("TM"), and other neuroinflammatory conditions. Id. He has authored papers on neurological disorders and neurotropic viruses, including HIV and John Cunningham ("JC"). Pet. Ex. 30 at 9-15; Pet. Ex. 7 at 2. Dr. Tornatore serves as a review boards for medical journals, including the Annals of Neurology and Medical Virology. Pet. Ex. 30 at 5. Dr. Tornatore is still involved in clinical care and has treated patients with herpes encephalitis. Tr. 30. He was admitted as an expert in the fields of neurology and neuroimmunology. Tr. 32.

##### b. Opinion

###### i. Background and Diagnosis

Dr. Tornatore offered inconsistent opinions about when Petitioner's HSV replication began. On one hand, he opined that Petitioner had asymptomatic HSV replication occurring at the time she received the flu vaccine on September 22, 2015, and the vaccine-induced lymphopenia allowed the herpes virus to "escape immunosurveillance and further propagate in the [central nervous system], resulting in herpes encephalitis." Pet. Ex. 17 at 3; Tr. 33. But he also opined that Petitioner developed HSV reactivation 48-hours after receipt of the flu vaccine. Pet. Ex. 7 at 10; Tr. 33.

HSV type 1 and 2 are neurotropic viruses that infect neurons of the nervous system. Pet. Ex. 8 at 9; Tr. 34. HSV attaches to the nerves and will become latent after it infects the nerves. Id.; Tr. 34. HSV-1 may reactivate in the peripheral nervous system or within the central nervous system, and can at times, lead to a productive infection in the brain called Herpes encephalitis.

[8] Dr. Tornatore testified at the hearing and submitted two expert reports. Tr. 24; Pet. Exs. 8, 17.

Pet. Ex. 8 at 9; see Pet. Ex. 23.[9] Herpes encephalitis manifests as an acute and focal necrotizing infection most generally found in the frontal and temporal lobes of the brain. Pet. Ex. 23 at 2. Survival rates of HSV encephalitis are at 70% with lifelong neurological deficits, such as anterograde amnesia, difficulty with executive function, and aphasia. Id.

According to Dr. Tornatore, HSV is typically transmitted through mucous membranes or damaged skin, and then infects sensory neurons, and can travel to the neuronal cell body in the dorsal root ganglion via fast retrograde axonal transport. Resp. Ex. M at 2;[10] Tr. 66. Once a person is infected with HSV, the immune system has a complex system that limits viral replication. Pet. Ex. 8 at 9; Pet. Ex. 25 at 3.[11] The innate immune response recognizes viral proteins through toll-like receptors, resulting in activation of pro-inflammatory cytokines, particularly Type II interferons and IL-1β, which can inhibit viral replication, promote destruction of infected cells, and recruit other cells to clear infected cells. Pet. Ex. 25 at 3. Further, resident HSV-specific T-cells have been found at the site of sensory neuronal nerve endings, suggesting an immune surveillance system that can be activated when subclinical viral replication occurs. Id.; Tr. 39; see also Resp. Ex. D at 1.[12]

Sawtell and Thompson, cited by Dr. Tornatore, explained that fundamental to HSV reactivation in humans is the ability to establish and maintain residence of its "genome in a latent state." Pet. Ex. 19 at 1.[13] "During primary infection at the body surface, the virus is transported through the axonal processes of innervating sensory neurons to the cell body, where it resides in a latent state. Periodic reactivation of this latent virus can result in a lifelong course of recurrent disease." Id. The authors noted that the mechanism "underlying the induction-reactivation pathway" is unknown. Id. The mouse study by Sawtell and Thompson showed HSV present in ganglion neurons could rapidly reactivate under extreme heat (core body temperature was increased to 43 degrees Celsius[14] and was reached at seven minutes and maintained for just over three minutes). Id. The study demonstrated the "switch from latent to active viral gene

---

[9] Chandra M. Menendez & Daniel J.J. Carr, Defining Nervous System Susceptibility During Acute and Latent Herpes Simplex Virus-1 Infection, 308 J. Neuroimmunol. 43 (2017).

[10] Michael J. Bradshaw & Arun Venkatesan, Herpes Simplex Virus-1 Encephalitis in Adults: Pathophysiology, Diagnosis, and Management, 13 Neurotherapeutics 493 (2016).

[11] Lynn M. Hassman & David A. DiLoreto, Immunologic Factors May Play a Role in Herpes Simplex Virus 1 Reactivation in the Brain and Retina After Influenza Vaccination, 6 IDCases 47 (2016).

[12] Karen E. Mark et al., Rapidly Cleared Episodes of Herpes Simplex Virus Reactivation in Immunocompetent Adults, 198 J. Infect. Dis. 198 (2008).

[13] N.M. Sawtell & R.L. Thompson, Rapid In Vivo Reactivation of Herpes Simplex Virus in Latently Infected Murine Ganglionic Neurons After Transient Hyperthermia, 66 J. Virol. 2150 (1992).

[14] This is 109.4º Fahrenheit.

transcription" and showed that the "neuron is the site of reactivation and infectious virion production." Id. "HSV antigens were "not detected in any other cell type, and lateral spread of the infection was not observed." Id.

Sawtell and Thompson described a "mononuclear cell infiltrated localized to regions of reactivating neurons was observed in ganglia" at 24 hours after treatment. Pet. Ex. 19 at 5. The authors concluded that this reflected a "rapid and aggressive immune response directed at reactivating neurons." Id. Lastly, the authors reported that "at least some neurons in which HSV antigens are detected during reactivation do not survive." Id. Dr. Tornatore explained that the neurons infected with HSV began to replicate and spread, noting they displayed degenerative changes, likely not surviving the viral reactivation. Tr. 41 (citing Pet. Ex. 19 at 5). Thus, Dr. Tornatore testified that the HSV replicated, killed some nerves, and if there was "not an adequate immune system, that virus would then have been released and could have spread." Id. He conceded that in the mouse study, the animals were "immune competent" and were "able to keep the virus from spreading." Id. But he suggested that if there is not an immune system response to the virus, it "could [] infect adjacent cells, including if there are dendrites in the brain." Id.

HSV reactivation does not always lead to symptoms or encephalitis. Tr. 48. Dr. Tornatore, referencing Hassman and DiLoreto, explained that "latent and replicative HSV[] have been detected in the central nervous system of 30-55% of clinically asymptomatic autopsy cases, suggesting an alarmingly high rate of viral spread from the periphery to the [central nervous system]." Tr. 48 (citing Pet. Ex. 25 at 3). But despite the frequency of HSV infection found in the central nervous system, herpes encephalitis is "quite rare with prevalence estimates of 1/250-500,000."[15] Pet. Ex. 25 at 3. Dr. Tornatore suggested that the reason that HSV does not cause more central nervous system illnesses is because the immune system keeps it under control. Tr. 49.

### ii. Loving Factors One, Two, and Three

With respect to Loving factor one (condition prior to the vaccination), Dr. Tornatore opined that if Petitioner was experiencing HSV reactivation at the time of vaccination, she was clinically asymptomatic. Pet. Ex. 17 at 3; Tr. 66, 82. He stated that Petitioner was not demonstrating any neurological symptoms consistent with HSV encephalitis on the day of the vaccination. Tr. 83. He opined there were two scenarios. First, it was "possible" that HSV had already infected Petitioner's central nervous system, but the immune system was regulating the virus. Tr. 66, 82. However, he noted Petitioner was not demonstrating any neurological symptoms or dermal symptoms prior to vaccination. Tr. 83. If there was a "teeny little bit" of virus in the brain, he said that would explain why Petitioner developed encephalitis so quickly. Tr. 67. Dr. Tornatore postulated that the second scenario was that Petitioner did not have viral replication in the brain at the time of vaccination, was vaccinated, and within 14 hours had replication of the virus. Tr. 82. In support of this second scenario, that the virus replicated

[15] The immune system has "[n]umerous host defense mechanisms to limit HSV infection." Pet. Ex. 25 at 3. Hassman and DiLoreto also provided a further summary of host defense mechanisms that maintain viral latency. Id.

within 14 hours, Dr. Tornatore cited the Sawtell and Thompson mouse study that showed replication occurred in 14 hours. Tr. 82 (citing Pet. Ex. 28 at 3).

Discussing Petitioner's post-vaccination condition (Loving factors two and three), Dr. Tornatore opined that the flu vaccine significantly aggravated her already replicating HSV, such that it affected her entire brain, starting in the left and moving to the right. Tr. 77-81. He explained that on September 24, 2015, Petitioner's MRI demonstrated changes to the left side of her brain and then by September 26, 2015, the next MRI demonstrated herpes encephalitis on the right side. Tr. 78-79; see also Pet. Ex. 6 at 81-86.

Dr. Tornatore explained that the day following the vaccination, Petitioner was experiencing fatigue and malaise, consistent with a normal response to a vaccination. Tr. 128. She rapidly developed neurological symptoms, such as right-sided weakness. Pet. Ex. 8 at 9. An MRI taken on September 24, 2015 showed early inflammatory changes and two days later, another MRI showed bilateral inflammatory changes in the context of an ongoing fever. Id. Her CSF fluid was positive for HSV, consistent with herpes encephalitis. Id. Dr. Tornatore opined that due to the rapid onset of Petitioner's encephalitis, particularly how the encephalitis spread from the left side to the right side, she experienced a significant aggravation of ongoing HSV activation. Tr. 82.

### iii. Loving Factor Four/Althen Prong One

Dr. Tornatore posited that the flu vaccine can cause or significantly aggravate an ongoing HSV replication process by inducing lymphopenia, whereby the lymphocytes decreased in numbers as well as physiology, leading to lymphopenia and "changing physiology of those lymphocytes," allowing the herpes virus to rapidly reactivate and expand, either in the ganglia or brain, resulting in HSV encephalitis. Pet. Ex. 8 at 10; Pet. Ex. 17 at 3; Tr. 51.

As explained above, Dr. Tornatore stated that once HSV infects an individual, it establishes a latent infection in the sensory neurons of the trigeminal ganglia,[16] or the nerves that go to the mouth and face. Pet. Ex. 8 at 9; see also Pet. Ex. 23 at 1; Tr. 34-35. HSV is a neurotropic virus—it likes to attach to nerves in the skin or the mouth and the dendrites or "little tentacles" of the nerves. Tr. 34. Once the virus attaches to the nerve, it takes up residence and its DNA becomes part of the nerve itself and becomes latent. Id. During latency, it does not make a new virus. Id. When it reactivates, the virus takes "advantage of the host mechanism and makes proteins" (RNA and DNA) and the "virus will reassemble, and then it will bud and come out of the nerve." Tr. 35. HSV is a common infection, with seropositivity among older adults between 60-90%. Resp. Ex. M at 2.

---

[16] The trigeminal ganglion is a large group of nerve cells located outside the central nervous system on the sensory root of the fifth cranial nerve. Ganglion, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=19717 (last visited July 6, 2026); Ganglion of Trigeminal Nerve, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=78155 (last visited July 6, 2026).

Consistent with the medical literature, Dr. Tornatore explained that HSV reactivation and replication is "kept in check" by both the innate and adaptive immune system. Pet. Ex. 8 at 9; Tr. 36-39. The Piret and Boivin review of HSV encephalitis described the importance of the innate immune system's response to HSV, stating "the inability to rapidly generate an adequate innate immune response to the virus could ultimately lead to a loss of viral containment." Pet. Ex. 24 at 9.[17] Further, adaptive immune cells, such as resident CD8 +T cells[18] in the trigeminal ganglia also contribute to the virus remaining in a latent state. Pet. Ex. 8 at 9; see also Resp. Ex. M at 2; Tr. 36-38.

Referring to the Hassman and DiLoreto article, Dr. Tornatore testified that HSV may have already infected Petitioner's trigeminal ganglia and was latent. Tr. 49. Hassman and DiLoreto explain, "Post-mortem histology and PCR performed on patients without clinically apparent infection demonstrates HSV[] in the trigeminal ganglia in 60% of autopsy cases." Pet. Ex. 25 at 3; see also Tr. 48. Dr. Tornatore stated that the immune system is keeping the latent virus under control, and it may just be "waiting to replicate." Tr. 49.

Dr. Tornatore posited that the flu vaccine could temporarily induce lymphopenia in older adults, disrupting the immune system's surveillance of HSV, allowing it replicate, resulting in encephalitis. Pet. Ex. 8 at 10; Pet. Ex. 17 at 1; Tr. 43-44, 57-64. To support his opinion that the flu vaccine can induce lymphopenia, Dr. Tornatore referred to Cummins et al., a case report and study of white blood cell counts in 70 adults over the age of 65 after receiving the flu vaccine which found that "total [white blood cell] counts were significantly lower at 4 weeks [post-vaccination] than at baseline." Pet. Ex. 26 at 1.[19] Despite finding the change in lymphocytes, Cummins et al. concluded, "The overall magnitude of this change was small and unlikely to be of important clinical significance. That the effect on the lymphocyte count was related to the vaccine rather than a viral infection prevalent locally at the time of our study is not possible to establish." Id. at 3.

Dr. Tornatore also referred to the Hassman and DiLoreto, case report of a patient who developed three episodes of HSV central nervous system events after receiving three yearly flu vaccines, and was also found to have low lymphocyte levels during his treatment. Pet. Ex. 8 at 10; Tr. 46; see also Pet. Ex. 25. In Hassman and DiLoreto, the adult patient had a history of cold sores as a child, and was 47 years old with insulin dependent diabetes when he received a seasonal flu vaccine 10 days prior to presenting to the emergency department with a fever,

---

[17] Jocelyn Piret & Guy Boivin, Innate Immune Response During Herpes Simplex Virus Encephalitis and Development of Immunomodulatory Strategies, 25 Rev. Med. Virol. 300 (2015).

[18] CD-8 T-cells are "T lymphocytes that carry the CD-8 antigen; major subtypes are the cytotoxic T lymphocytes and the suppressor T-cells." CD8 Cells, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=64001 (last visited July 6, 2026).

[19] D. Cummins et al., Haematological Changes Associated with Influenza Vaccination in People Aged Over 65: Case Report and Prospective Study, 20 Clin. Lab. Haem. 285 (1998).

aphasia and dysnomia, weakness, and malaise. Pet. Ex. 25 at 1. While hospitalized, his lymphocyte level was "consistently low,"[20] and he was diagnosed with HSV encephalitis. Id. Eleven months later, the same patient, developed aphasia and dysnomia three days after receiving the flu vaccine. Id. at 1-2. His lymphocyte level was again low (1100/mm3), and his symptoms were resolved with anti-viral treatment. Id. at 2. Then one year later, the patient developed eye pain, tearing and loss of vision in the left eye one day following the flu vaccination. Id. The patient was positive for HSV and again, he had decreased lymphocytes (1200/mm3). Id.

Factors that impact the ability to clear HSV infection and/or reasons why the patient in Hassman and DiLoreto had recurrent episodes of HSV reactivation following vaccination were described as "multiple host and viral factors that contributed to [] disease." Pet. Ex. 25 at 4; see also Tr. 46. One factor was that during the patient's episodes, he had 25-75% fewer circulating CD4 T-cells than normal, and this "could translate to a relative paucity in immune surveillance within the CNS." Pet. Ex. 25 at 4. Second, the patient may have had a "subtle immunologic deficiency" that "lowered the threshold for clinically significant HSV reactivation in the CNS." Id. They also hypothesized that "vaccination may have drawn T-cells normally involved in the [central nervous system] immune surveillance toward the vaccine response, allowing viral reactivation to proceed unchecked." Id. Lastly, "vaccine-induced inflammatory cytokines may have triggered viral reactivation directly, or indirectly via neurotoxicity or loss of neurotrophic support." Id.

Acknowledging that science does not "have a good handle" on the cause of reactivation leading to herpes central nervous system conditions, Dr. Tornatore turned to the theories suggested by Hassman and DiLoreto, as additional mechanisms by which the flu vaccine could cause HSV reactivation in the CNS. Tr. 56-57. Dr. Tornatore explained that "T cells get distracted to the area of where the vaccine was." Tr. 57. He suggested again that Petitioner may have had a cytokine/chemokine response to the vaccine—she felt very fatigued—and this response may have caused the decrease in lymphocytes. Id. Additionally, Dr. Tornatore cited the paper by Oh et al., about immunosenescence due to aging, and suggested that there were "exhausted T cells, senescent T cells" that were unable to fight off HSV, and vaccination led to cytokines that further exhausted the T cells. Tr. 58-60 (citing Pet. Ex. 27).[21]

Oh et al. described changes in the innate and adaptive immune cells that occur as people age, including how the number of naïve T-cells decrease, while the number of "senescent T-cells" increase, and elder exhibit "greater T-cell exhaustion." Pet. Ex. 27 at 8. Specific to latent viruses, such as varicella zoster virus ("VZV"), Oh et al. explained that while the exact mechanisms for VZV reactivation and susceptibility in the elderly is unknown, "recent studies suggest aging cells as the cause of the inefficient clearance of virus-infected cells." Id. at 10. The authors noted that the absolute number of CD3, CD4, and CD8 T cells in VZV patients were

---

[20] The patient's absolute lymphocyte counts were "between 400-800/mm3 (normal range 1300-3600/mm3)." Pet. Ex. 25 at 1.

[21] Soo-Jin Oh et al., Aging and the Immune System: The Impact of Immunosenescence on Viral Infection, Immunity and Vaccine Immunogenicity, 19 Immune Nets. E37 (2019).

"significantly lower compared to those in the control," but did not suggest that the decrease in these cells were caused by anything other than age-related changes. Id. Regarding this last theory related to aging, Dr. Tornatore noted that he was speculating to suggest that "exhausted or senescent cells" could cause the flu vaccine to lead to a decrease in lymphocytes. Tr. 60-64.

Dr. Tornatore opined that because HSV replication can occur rapidly, onset of encephalitis can occur within a short period of time in an immunocompromised person, such as an older adult with a weak immune system. Tr. 69; Pet. Ex. 17 at 2. He referred to the Sawtell and Thompson article, which examined HSV reactivation in mice, and found that a replicating virus could be found in the trigeminal ganglia as soon as 14 hours after heat stress was induced. Pet. Ex. 28 at 3. However, the authors observed that "[t]he number of antigen-positive neurons detected was low (1 to 3 neurons positive per reactivating ganglion)," [] that "HSV antigens were not detected in any other cell type within the ganglion, and the lateral spread of the virus was not seen." Id. at 5. This article suggests that viral replication occurs inside the ganglionic neurons, but also that after 14 hours of stimulation, the number of affected neurons is relatively low. Lastly, Sawtell and Thompson explained that other studies have found a longer period of time for HSV reactivation. Id. Further, they reported that there is limited understanding of how HSV reactivation occurs, noting "[t]here may be multiple pathways leading to the reactivation of this virus, and the variety of stimuli known to reactivate HSV supports this." Id. at 6.

On cross-examination, Dr. Tornatore agreed that the trigeminal ganglia are in the peripheral nervous system, but he testified the ganglia was in close proximity so as to cause shedding of the virus into the nervous system. Tr. 121. Regardless, he agreed that the mice in the Sawtell and Thompson study did not develop HSV encephalitis because they were sacrificed fairly early. Id. However, Dr. Tornatore noted that HSV replicated and killed the neurons within the ganglia, not the brain, within 14 hours, which indicated that there could be neuronal death which would "lead to shedding of the virus locally into the nervous system." Tr. 122. Dr. Tornatore agreed that the study did not show HSV antigens in any other cell type, other than the ganglionic nerves, but he countered that these mice were "immunocompetent animals" with an intact immune system, so the study does not show how the virus could spread in a host that was immunocompromised. Tr. 123. He then asserted that due to her age, Petitioner was immumosenescencent, or susceptible to rare complications of vaccines. Id. But he agreed that there was no evidence that Petitioner was immunocompromised. Id.

When asked on cross-examination if it was more likely than not that Petitioner had latent HSV in her brain when she received the flu vaccine, Dr. Tornatore testified, "I can say that it's a possibility, but beyond that, I don't think we can say that, because she was asymptomatic." Tr. 102. He clarified his theory, stating "[o]ne scenario is the [HSV] virus was completely latent. [Petitioner] gets vaccinated, and then it reactivates, and then we get HSV. I think that is very probable that could happen." Tr. 103. He continued stating that it was "possible" that Petitioner had some HSV already in her brain, but that was "a little speculative, but is it probable that it could have just been latent? You get vaccinated. You get release of the virus, and then you get encephalitis. That's very probable." Id.

In her post-hearing brief, Petitioner referred to the Wei et al. article to support a causal link between the flu vaccine and HSV reactivation. Pet. Br. at 19-20. Wei et al. examined the

incidence of herpes zoster (shingles)[22] reactivation post-flu vaccination and found a "marginal increase" in herpes zoster incidence one to 15 days in older adults who had received the flu vaccine. Pet. Ex. 29 at 4.[23] With respect to why there was a slight increase in herpes zoster, the authors indicated "[i]t [was] unclear whether [flu] vaccines directly or indirectly reactive VZV from its latent state. Immunization may impose significant psychological and physical stress. Stress alone, however, is unlikely to be the sole cause." Id. They noted, with regard to Covid-19 vaccinations, "there is speculation that dysregulation of T cells and cellular immunity, which are supposed to occur due to immune modulation caused by the target vectors or adjuvant[24] of the vaccines, might be involved in reactivating the virus."[25] Id.

In summary, Dr. Tornatore's leading theory is that the flu vaccine induced lymphopenia, allowing the latent HSV virus to rapidly replicate, leading to HSV encephalitis or that vaccine-induced lymphopenia "significantly aggravated" the already replicating virus, inducing HSV symptoms faster and causing a more severe course. Pet. Ex. 8 at 10; Pet. Ex. 17 at 1.

**iv. Loving Factor Five/Althen Prong Two**

Dr. Tornatore opined that the flu vaccination on September 22, 2015 caused Petitioner to develop HSV encephalitis or significantly aggravated her already developing HSV encephalitis. Pet. Ex. 17 at 3; Tr. 67. He stated, "[Petitioner] did not follow the natural course of viral clearance either due to vaccine-induced viral replication and/or vaccine-induced lymphopenia with subsequent lack of viral surveillance." Pet. Ex. 17 at 3.

Dr. Tornatore testified Petitioner's clinical course was consistent with his theory. Tr. 77. Petitioner was not exhibiting any neurological signs prior to her vaccination. Tr. 83. She began to feel ill the following day, demonstrating neurological symptoms such as right-sided weakness and speech difficulty. Tr. 131; see Pet. Ex. 6 at 7. Petitioner's lymphocyte counts were normal the first three days after vaccination but dropped on day three. Tr. 74. Specifically, on September 23, Petitioner's lymphocyte count was 2,200; on September 24, it was 1,200; and on September 25, it was 800. Id. (citing Pet. Ex. 6 at 48, 81). Dr. Tornatore agreed that the first two counts (2,200 and 1,200) were normal based on the hospital laboratory reference range. Tr. 104. He also agreed that Petitioner's only abnormal lymphocyte count was 800, which was just below the normal reference range. Tr. 105. Dr. Tornatore also agreed that the following day, September 26, Petitioner's lymphocyte count was back in the normal range at 1,400 (1.4). Tr.

---

[22] Herpes zoster (shingles) is "an acute, infectious, usually self-limited disease believed to represent activation of latent human herpesvirus 3 in those who have become partially immune after an attack of chickenpox." Herpes Zoster, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=80827 (last visited July 6, 2026).

[23] Kai-Che Wei et al., Influenza Vaccine and Subsequent Development of Zoster, 17 Influenza Other Respi. Viruses e13055 (2023), doi.org/10.1111/irv.13055.

[25] There is no evidence that the flu vaccination at issue in this case used target vector technology or that it contained adjuvants. See Resp. Ex. J.

106. Dr. Tornatore further acknowledged that Petitioner was never diagnosed with lymphopenia. Id.

In addition to decreasing numbers of lymphocytes, Dr. Tornatore opined that the lymphocytes available were "not functioning normally" since they were dying (approximately one-half died from September 23 to 24). Tr. 75, 103-05. He described the lymphocytes present as stunned, senescent, or exhausted. Tr. 74, 103-04. Further, he stated that the trajectory of the numbers and the effect on the physiology due to the death of lymphocytes was relevant. Tr. 105-06.

Regarding the question of whether the decrease in Petitioner's lymphocytes was caused by reactivation of the herpes virus or vaccination, Dr. Tornatore did not think it was caused by the herpes virus reactivation. Tr. 76-77. He stated that while a decrease in lymphocytes can occur with other viruses, it is not seen with the herpes virus. Id. He further noted that the herpes virus does not multiply in lymphocytes. Id. Thus, he opined that the greater likelihood was that the decreased lymphocyte counts was caused by the vaccine and not the virus. Tr. 77.

On cross-examination, Dr. Tornatore was asked about the Cummins et al. study, where the authors noted whether "the effect on the lymphocyte count was related to the vaccine rather than a viral infection prevalent locally at the time of [their] study [was] not possible to establish." Tr. 114; Pet. Ex. 26 at 3. In the study, counts were not measured at 24 or 48 hours[26] but testing was performed at 14 and 28 days, and lymphocyte counts were significantly lower at four weeks post-vaccination. Tr. 112-14 (citing Pet. Ex. 26). Four subjects had counts as low as 600, but none of these subjects had symptoms. Id. The authors concluded that the "overall magnitude of this change was small and unlikely to be of important clinical significance." Pet. Ex. 26 at 3. Further, they stated that "[l]ymphocytopenia is a recognized feature of both acute and chronic viral infections," but noted they were "not aware that depression of the lymphocyte count has been linked to vaccination against a viral disease. Again, if this effect is vaccine related it cannot be due to viral replication: whether it represents an effect of 'stress' or feature of the host immune response remains to be established." Id.

Dr. Tornatore opined that Cummins et al. showed lymphopenia, and although none of the subjects became ill, "that does not rule out the possibility that someone could have lymphopenia and then have an adverse outcome." Tr. 114. He also cited two case reports, the Hassman and DiLoreto case (discussed above), and one noted by the Institute of Medicine ("IOM"), published

[26] The authors explained that testing was done on 14 and 28 days for several reasons, including that they wanted to "cover the period of maximal antibody response to [flu] antigens" and because "hematological changes following other viral immunizations have been reported to occur during this period." Pet. Ex. 26 at 2-3. However, they acknowledged the limitations due to the lack of more frequent testing, namely that the data may have underestimated "the incidence and severity of hematologic effects." Id. at 3.

by Froissart,[27] that described a patient who had two consecutive episodes of meningoencephalitis two days after receiving the flu vaccination. Tr. 118 (citing Resp. Ex. E at 5).[28]

He stated that Petitioner received the vaccine and then "her lymphocyte activity and number drop[ped]," and "[t]hat allow[ed] the virus which is already in the trigeminal ganglia and possibly maybe a little bit in the brain, to then start to multiply, and then cause herpes." Tr. 77-78. He observed that Petitioner's initial MRI taken on September 24, 2015 showed changes on the left side of the brain and that day her lymphocyte count was 1,200. Tr. 79; see also Pet. Ex. 6 at 80. Two days later, Petitioner's MRI showed the right side of the brain, which was previously normal, had herpes encephalitis. Tr. 79. Dr. Tornatore testified that Petitioner's MRIs, in the context of lymphopenia, demonstrate in "real time . . . very rapid viral replication, very rapid encephalitis is happening." Tr. 79-80. He noted that on September 25, 2015, her lymphocyte count dropped to 800. Tr. 80; see also Pet. Ex. 6 at 47.

In response to Respondent's expert Dr. Leist's opinion that the vaccination did not cause Petitioner's lymphocyte count to drop, and that there were other reasons to explain the decrease, Dr. Tornatore disagreed. Tr. 209. He disagreed that Petitioner was in the ICU on the day that her lymphocyte count was low, or that she had any interventions which would explain the decrease. Id. Dr. Tornatore opined that the only reason that Petitioner had lymphopenia was the prior vaccine. Tr. 210. He also opined that it was unlikely that HSV caused a "significant change" in the lymphocyte levels, because it is not a "leukotropic virus." Tr. 214-15. And he noted that Dr. Leist had offered a similar opinion. Tr. 214.

Next, Dr. Tornatore testified that Petitioner's treating physicians associated her encephalitis to the flu vaccine but he conceded that the physicians were "thinking more in terms of an autoimmune encephalitis," which Dr. Tornatore agreed Petitioner did not have based on her clinical presentation. Tr. 88. For example, when Petitioner was being treated at MCMC on September 23, 2015, Dr. Charles Tuen wrote, "Patient had a flu shot recently, and she had some flu-like symptoms after the flu shot. History is less suggestive of post-vaccination encephalitis, but will monitor closely." Pet. Ex. 6 at 11. During Petitioner's admission at Baylor University Medical Center, her treating neurologist wrote:

> 68-year old female, hypertension, hysterectomy, appendectomy who presented with acute confusion/right side weakness and receive IV tPA in OSH with angioedema. She was febrile, got clinically worse, and was subsequently found to Lymphocytic Pleocytosis (CSF R4, W71-83% L). MRI shows left insular, bilateral mesiofrontal and left mesiofrontal inflammation which has gotten worse on subsequent imaging. She did receive flu vaccine several hours prior to symptom onset. Working diagnosis meningoencephalitis either due to viral infection such as HSV or due to vaccine reaction.

Pet. Ex. 3 at 6602.

[27] This article was not filed.

[28] Inst. of Med., Adverse Effects of Vaccines: Evidence and Casualty (Kathleen Stratton et al. eds., 2012).

In addition to the vaccine-induced lymphopenia, Dr. Tornatore opined that because Petitioner's immune system was already "weakened with age," and there was "inadequate immunity to keep [HSV] from multiplying," the virus "replicates very quickly," which is how Petitioner could develop encephalitis within a very short period. Tr. 69. He again referred to the Sawtell and Thompson article, which induced rapid viral replication within 14 hours after hyperthermia in mice and that neurons were destroyed. Pet. Ex. 28 at 6. Dr. Tornatore testified that because of the vaccine, "you could argue that because you get the loss of immune surveillance . . . the virus will [] replicate very rapidly." Tr. 70.

When Dr. Leist raised the possibility that Petitioner's HSV reactivation was likely ongoing at the time the flu vaccine was administered, Dr. Tornatore testified that it was "possible" the virus was already replicating but did not rise to the level of clinical encephalitis when Petitioner received the vaccine. Tr. 67. He stated that "if the virus is already sitting in the brain, then it can replicate that much quicker. You don't have to wait for it to replicate in the trigeminal nerve, and then subsequently spread out. That happens very quickly anyway." Tr. 67-68. Dr. Tornatore opined that the "the deactivation of the lymphocytic system in an older person could result in a more rapid onset of encephalitis." Tr. 68.

Dr. Tornatore hypothesized that if the virus was already replicating in the trigeminal ganglia, then the vaccine caused the lymphocytes to "get stunned" and the replication took off and "caused bona fide encephalitis." Tr. 82. Dr. Tornatore testified that over the next two days, Petitioner's lymphocyte count dropped even more, causing the encephalitis to develop on the right side of her brain. Tr. 83. He opined that Petitioner had an already weakened immune system due to her age, then received the vaccine, and Petitioner's immune system's ability to "keep that virus in check" was not present. Tr. 86.

Dr. Tornatore concluded that there was a logical sequence of cause and effect because Petitioner rapidly developed HSV encephalitis after receiving the flu vaccine. Pet. Ex. 8 at 11; Pet. Ex. 17 at 1.

#### v. <u>Loving</u> Factor Six/<u>Althen</u> Prong Three

Dr. Tornatore stated that Petitioner's onset of HSV encephalitis occurred one-day after she received the flu vaccine when she began to experience malaise and fatigue, followed by neurological symptoms. Pet. Ex. 8 at 9. In addition to opining that onset occurred in one day, he also opined that the rapid onset of lymphopenia within 48 hours of vaccination, was "consistent with a vaccine-induced lymphopenia." <u>Id.</u> at 10. "There was a very significant impact of the lymphocytes, on the immune system, and [in] somebody who had immunosenescence with exhausted or senescent cells, the virus now can replicate quickly, and then it infects the brain, and you get herpes encephalitis." Tr. 89-90.

Dr. Tornatore testified that the Sawtell and Thompson and Hassman and DiLoreto articles support a rapid onset of encephalitis. Tr. 89. Referring to the Sawtell and Thompson article, Dr. Tornatore stated that the authors found "active viral replication *in vivo* 14 hours after hyperthermia," and that it demonstrates rapid viral replication and neuronal death, providing a

"great example" of what can happen in those "susceptible to HSV encephalitis." Pet. Ex. 17 at 2; Tr. 122. Dr. Tornatore stressed that the Sawtell and Thompson article showed HSV replication *in vivo*, and not *in vitro*, which in his opinion is "far more representative of viral biology than an *in vitro* model given the multi-organ interplay that occurs with viral replication and propagation." Pet. Ex. 17 at 2-3.

He testified that the patient described in the Hassman and DiLoreto article also had a very rapid onset of HSV encephalitis after receiving the flu vaccine. Tr. 89-90, 102; Pet. Ex. 8 at 10. The Hassman and DiLoreto article endorses a temporal association between the flu vaccine and HSV reactivation in their patient: "In our patient, there was a reproducible temporal relationship between sequential [flu] vaccinations and HSV reactivation. He first presented with encephalitis just days after vaccination. The following year, he presented with similar, albeit milder symptoms." Pet. Ex. 25 at 4; Tr. 102. However, unlike the Petitioner in this case, the patient described in Hassman and DiLoreto received the flu vaccine ten days prior to the onset of symptoms in his first HSV central nervous system event, not one day. Pet. Ex. 25 at 1; Tr. 109. Dr. Tornatore acknowledged the onset difference between the patient in Hassman and DiLoreto as compared to Petitioner; however, he pointed out that the abstract stated the patient had three consecutive yearly HSV episodes, "each within days of his [flu] vaccination." Tr. 111 (citing Pet. Ex. 25 at 1). Because the authors used the phrase "within days," Dr. Tornatore opined that the patient's lymphopenia occurred within days of vaccination.[29] Id. Regardless, Dr. Tornatore opined that the Hassman and DiLoreto case represented challenge/rechallenge, that the patient had symptoms within days, and they referenced lymphopenia with all three episodes. Tr. 112.

Dr. Tornatore explained that in his opinion, it was speculative (or only possible) to conclude that Petitioner's HSV replication was already occurring at the time of vaccination. Tr. 102, 112, 129. Petitioner had no symptoms before vaccination. Tr. 129. Therefore, he opined it was more probable that the virus was "completely latent" and that viral replication began following vaccination. Tr. 103, 129. The onset of Petitioner's neurological disease was evident by noon on September 23, the day after she received her vaccination, when she exhibited right-sided weakness and speech difficulty. Tr. 130. Dr. Tornatore opined that the onset of Petitioner's symptoms was consistent with his theory that the vaccine induced lymphopenia, allowing rapid replication of HSV, resulting in encephalitis. Pet. Ex. 17 at 1. He opined that the onset was appropriate if the vaccine caused viral replication *de novo* or if HSV was already replicating (at the time of vaccination) and the vaccine caused a faster and more aggressive HSV encephalitis. Id.; Tr. 90.

---

[29] Hassman and DiLoreto does not report the dates that the patient's lymphocytes counts were tested, noting that his counts were "consistently low throughout his hospitalization" during the first episode, that he had a low lymphocyte count during his second episode, and that his lymphocytes were again decreased at his third episode. Pet. Ex. 25 at 2-5.

### 2. Respondent's Expert, Dr. Thomas Leist

#### a. Background and Qualifications

Dr. Leist is a board-certified neurologist who is "involved in the care of patients with neurological and neuroimmunological and neuro-virological conditions, including [MS], [NMO] spectrum disorder, and infectious conditions of the central nervous system, including herpes encephalitis." Resp. Ex. A at 1. Dr. Leist studied at the University of Zurich before receiving his medical degree from the University of Miami in 1993. Resp. Ex. B at 1. After medical school, Dr. Leist was an intern at the University of Miami and completed his residency in neurology at Cornell Medical Center/Sloan Kettering Memorial Cancer Center in New York. Id. He worked as a clinical staff associate at the National Institute of Health between 1997-2000. Id. Dr. Leist became a professor of Neurology at Thomas Jefferson University in 2000, and has continued his teaching career at Thomas Jefferson University until present day. Id. He has served as the Director of the Comprehensive MS Center and Clinical Neuroimmunology Fellowship Program at Thomas Jefferson University and Affiliated Hospitals. Id. at 2. Dr. Leist has served as a reviewer for several medical publications, including the Journal of Neuroimmunology, Lancet Neurology, Neurology, and Multiple Sclerosis. Id. Dr. Leist has authored or co-authored over 60 medical articles in the field of neurology. Id. at 6-11. He treats approximately four patients per year with herpes encephalitis, and over his career has probably cared for 60 to 80 such patients. Tr. 144. Dr. Leist was admitted as an expert in the field of neurology and neuroimmunology. Tr. 146.

#### b. Opinion

Dr. Leist's opinion was focused on Dr. Tornatore's opinion that the flu vaccine could cause or significantly aggravating an ongoing HSV replication resulting in encephalitis one day later; he did not dispute Petitioner's diagnosis. Resp. Ex. A at 3-5; Resp. Ex. G at 1-4; Tr. 147-48.

##### i. Loving Prong Four/Althen Prong One

Dr. Leist agreed with Dr. Tornatore that herpes encephalitis is caused by herpes simplex-1 and it is caused by a reactivation of HSV in the trigeminal ganglions that enters the central nervous system. Tr. 150. Herpes reactivations occur frequently, but in most people the reactivations are asymptomatic and unrecognized. Tr. 148. He agreed that once herpes encephalitis occurs, the outcomes are bad. Tr. 151.

The mechanisms by which HSV causes herpes encephalitis is "very often reactivation from the trigeminal ganglions," and then the virus travels into the central nervous system. Tr. 150. Another mechanism is olfactory bulb[30] infection, which can cause a primary HSV infection

[30] The olfactory bulb refers to "the bulblike expansion of the olfactory tract on the undersurface of the frontal lobe of each cerebral hemisphere; the olfactory nerves enter it." Bulbus Olfactorius, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=61954 (last visited July 6, 2026).

and then the virus can be "retrogradely transported" to the central nervous system. Id. Dr. Leist explained that the central nervous system is "an immune sanctuary site." Id. Once a proinflammatory environment is established, the herpes virus replicates and may affect cells other than neurons. Id. The virus is thought to spread "along neurons or neuronal tracks, [] along axons." Tr. 150-51.

Addressing Petitioner's mechanistic theories, Dr. Leist acknowledged that Dr. Tornatore offered two scenarios. The first is that Petitioner had had reactivation of the herpes virus prior to vaccination and some of the virus was already present in her central nervous system on September 22. Tr. 157-58. Following vaccination, the flu vaccination decreased her lymphocytes and caused less functionality of the lymphocytes which Dr. Tornatore asserted caused the virus to amplify "in a much more vigorous fashion." Id. Dr. Leist's understanding of the second scenario is that after vaccination, the vaccine "led to immobilization or death[] of lymphocytes that normally control reactivation of the virus" and this allowed the virus to replicate and cause herpes encephalitis. Tr. 158.

At the outset, Dr. Leist noted that he was not aware of any study or case series related to the flu vaccination causing herpes encephalitis. Tr. 158. He acknowledged that Petitioner had cited to cases of rechallenge after the flu vaccine, but he asserted there are no case series or animal studies where the flu vaccine has been shown to cause herpes encephalitis. Id.

Relative to the two scenarios posited by Dr. Tornatore, Dr. Leist agreed that Petitioner had previously been infected with HSV, and he believed the virus was likely already reactivated and active by the time she received the flu vaccine. Tr. 182; Resp. Ex. A at 6. Dr. Leist stated that the IOM had reviewed vaccination and encephalitis, including herpes encephalitis, and found that the "mechanistic evidence regarding an association between [flu] vaccine and encephalitis as weak based on knowledge about the natural infection and one case." Resp. Ex. E at 5; Tr. 159. He also referred to the Ghaderi et al. study, which found no increased risk of encephalitis after the H1N1 vaccine, but did observe an increased risk after a flu infection. Resp. Ex. G at 1-2 (citing Resp. Ex. H at 1);[31] Tr. 160. The Ghaderi et al. study did not identify any cases of encephalitis within seven days after the H1N1 flu vaccination. Resp. Ex. G at 6. Dr. Leist testified that this article showed an increased risk of encephalitis after a live replicating virus, not a "non-live vaccine." Tr. 161. He explained that the flu virus can infect multiple cells and spread throughout the body whereas a non-live vaccine does not replicate. Id.

Regarding the Hassman and DiLoreto article, Dr. Leist did not find it to constitute reliable evidence of a causal association between the flu vaccine and HSV reactivation due to a lack of information provided. Tr. 161 (citing Pet. Ex. 25). He first noted that the "precise timelines of the events are not necessarily visible" in the article, and that the second episode the patient experienced was more likely sequalae of the initial HSV encephalitis, not a second reactivation of herpes. Tr. 161-62 (citing Pet. Ex. 25 at 2 ("His symptoms resolved within hours without anti-viral treatment and a non-contrast MRI demonstrated only left temporal lobe encephalomalacia, which was felt to be sequelae of his prior HSE.")). The third episode

---

[31] Sara Ghaderi et al., Encephalitis After Influenza and Vaccination: A Nationwide Population-Based Registry Study from Norway, Int. J. of Epidem. 1618 (2017).

described onset of one day, which Dr. Leist opined was too short and the article did not explain how the virus would have replicated that quickly to cause the patient's visual problems. Tr. 162. Further, the authors note the complexity of HSV and host interface, and the patient presented with sepsis, and low lymphocyte counts were present throughout the hospital stay. Id. Due to these concerns, Dr. Leist did not conclude that the flu vaccine was the cause of the patient's lymphopenia, and he did not think that the authors reached such a conclusion. Tr. 164.

Dr. Leist also argued that Dr. Tornatore's reliance on vaccine-induced lymphopenia is not supported by the medical literature. Resp. Ex. G at 3-4; Tr. 163-64. He defined lymphopenia as a low lymphocyte count. Tr. 164. Dr. Leist testified that viral infections and medications can cause lymphopenia. Tr. 165. He also explained that lymphocytes can also increase during an infection with a fever. Id. Generally, he opined that lymphocyte changes associated with HSV would "probably be relatively mild," unless a patient had disseminated herpes, but that is not the case presented here. Tr. 165-66.

Dr. Leist stated that the Cummins et al. article relied on by Dr. Tornatore only tested the lymphocyte count of patients at two and four weeks after vaccination, making it difficult to determine what happened prior to those tests and the authors also concluded that the changes were "modest," thus, they were not dramatic. Tr. 169-70; Pet. Ex. 26. The authors concluded that "[t]he overall magnitude of this change was small and unlikely to be of important clinical significance." Tr. 168 (citing Pet. Ex. 26 at 3). Further, the study did not determine whether the effect on the lymphocyte count was caused by the vaccine or related to a viral infection. Tr. 168. Thus, Dr. Leist opined that Cummins et al. does not provide "valuable evidence" because it only shows lymphocyte counts at weeks two and four, the lymphocyte decrease was modest, and there was a confounding potential infection which may have affected the findings. Tr. 169-70. Moreover, Dr. Leist does not believe there is sufficient evidence to establish that the flu vaccine lowers lymphocyte counts. Tr. 170.

He also disagreed with Dr. Tornatore that the flu vaccine could cause a rapid reactivation of HSV within one day. Resp. Ex. A at 5; Tr. 170. Dr. Leist referred to the Sekizawa and Openshaw[32] article to demonstrate that HSV reactivation takes longer than one day and requires multiple factors, and opined that Petitioner's HSV reactivation had begun prior to vaccination. Resp. Ex. A at 5; Tr. 175. Sekizawa and Openshaw examined how HSV spreads from the trigeminal ganglia into the central nervous system using immunosuppressed mice[33] who did not have anti-HSV antibody, and found HSV viral replication from the ganglia to the brain took seven days after introducing the stressor. Resp. Ex. F at 1-2; Tr. 175. There were two factors contributing to HSV reactivation, the lack of HSV antibody and suppression using

---

[32] Tsuyoshi Sekizawa & Harry Openshaw, Encephalitis Resulting from Reactivation of Latent Herpes Simplex Virus, 50 J. Virol. 263 (1984).

[33] For an explanation of the methodology, see Resp. Ex. F at 1-3.

cyclophosphamide.[34] Resp. Ex. F at 1-2. Dr. Leist used this article to demonstrate that reactivation of HSV in the brain requires "more than one factor" and it takes longer than one day. Id. at 2.

Dr. Leist also referred to the Halford et al. article to support his opinion that HSV reactivation leading to encephalitis takes longer than one day. Tr. 176; Resp. Ex. C.[35] The article examined the mechanisms for how HSV-1 was reactivated. Resp Ex. C at 1. By using cultures of HSV and introducing different stressors, the study examined latency and reactivation to mimic *in vivo* reactivation. Id. Dr. Leist explained that Halford et al. used heat stress on the cell cultures and found that HSV replication "largely remained undetected in culture medium until 48 [hours]" and "replication had initiated in neurons by 24 [hours] after heat stress. The frequency of detecting HSV[] in culture supernatant increased from 3 to 40% between 24 and 48 hours." Id. at 8; see also Resp. Ex. A at 6; Tr. 176. Dr. Leist testified that the virus replicating in neurons after 24 hours "is the beginning" of viral replication and does not include the time it takes to cause infection of the temporal lobes of the brain and induce tissue injury resulting in neurologic symptoms. Tr. 176; Resp. Ex. A at 6. Dr. Leist stated that this study supports his opinion that reactivation of Petitioner's HSV occurred before she received the flu vaccine. Resp. Ex. A at 6.

With respect to Dr. Tornatore's opinion that Petitioner's age (immunosenescence) caused a more "rapid reactivation," Dr. Leist agreed that age is a risk factor for a more severe course and a bad outcome, but disagreed that Dr. Tornatore had provided evidence to support this idea that age made the virus more likely to reactivate. Tr. 179. Dr. Leist agreed that the Oh et al. article provided an overview of factors that contribute to immunosenescence, but noted that it did not address all the changes in the immune system that occur with aging. Tr. 181.

In conclusion, Dr. Leist testified that he did not believe that the flu vaccine caused Petitioner to develop herpes encephalitis, nor did it contribute or significantly aggravate her ongoing HSV reactivation leading to HSV encephalitis. Tr. 202-03; Resp. Ex. G at 2-3.

**ii. Loving Factor Five/Althen Prong Two**

Dr. Leist agreed with Dr. Tornatore that the correct diagnosis for Petitioner was HSV encephalitis. Tr. 147. He disagreed, however, that the flu vaccine caused or contributed to Petitioner's HSV reactivation or herpes encephalitis or that it caused a more rapid reactivation of already replicating HSV. Tr. 147, 178.

---

[34] Cyclophosphamide is "used as an antineoplastic, often in combination with other agents, for a wide variety of conditions" and is "used as an immunosuppressive agent to prevent transplant rejection and in the treatment of certain diseases with abnormal immune function." Cyclophosphamide, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=12166 (last visited July 6, 2026).

[35] William P. Halford et al., Mechanisms of Herpes Simplex Virus Type 1 Reactivation, 70 J. Virol. 5051 (1996).

Dr. Leist opined that Petitioner's flu vaccination on September 22, 2015 did not contribute to her HSV encephalitis, nor did it alter her clinical course, resulting in a worse outcome. Tr. 203. He further opined that there was not a logical cause and effect association between Petitioner's flu vaccination and her HSV reactivation and herpes encephalitis. Tr. 182.

Dr. Leist opined that Petitioner had the herpes virus and that either there she had longstanding HSV or she had a long period of latency. Tr. 183. He suggested that Petitioner's HSV encephalitis may have been caused by "an acquired primary" herpes infection, but it was unknown if the encephalitis was caused by a primary infection or the latent HSV. Id. However, he opined the most likely scenario is that she had reactivation of the virus, not a primary infection. Id.

Dr. Leist acknowledged that prior to receiving the vaccine, based on the records and Mrs. Spackey's testimony, Petitioner was not experiencing any clinical symptoms of HSV activation or herpes encephalitis. Tr. 184; Resp. Ex. A at 1-2. Relying this testimony and medical records, Dr. Leist stated that Petitioner began to experience neurological symptoms around noon on September 23, 2015, which included right-sided weakness and speech difficulty. Tr. 187. Dr. Leist opined these symptoms were "consistent with injury to the left fronto-temporal region," of her brain. Resp. Ex. G at 1; Tr. 190. Her MRI September 24, 2015 was also consistent with herpes encephalitis. Resp. Ex. G at 1; Tr. 190.

Dr. Leist referred to the Bradshaw and Venkatesan and Rabinstein[36] articles, which described the pathophysiology and clinical course of herpes encephalitis, to support his opinion that Petitioner's disease developed consistently with the known clinical course of the disease. Tr. 194; Resp. Exs. K, M. Bradshaw and Venkatesan explained that "[m]ost patients present with prodromal symptoms, suggesting upper respiratory tract or other systemic infection. Signs and symptoms of encephalitis then progress over the course of several days in most cases." Resp. Ex. M at 3. Bradshaw and Venkatesan also described neuroimaging, stating, "Typical findings on MRI include asymmetric hyperintense lesions on T2-weighted sequences corresponding to areas of edema in mesiotemporal and orbitofrontal lobes and the insular cortex." Id. at 4. Further, "[a]ccumulating evidence suggest that diffusion restriction on diffusion-weighted imaging is frequently seen early in the course of HSVE and may be among the earliest neuroradiologic manifestations." Id.

The Rabinstein article described brain imaging from patients with HSV encephalitis and explained that inflammatory edema seen on MRIs can be bilateral and that images with diffusion restriction are not only an early marker for the disease, but "may portend worse prognosis." Resp. Ex. K at 1. "Delay in the administration of acyclovir is the most common [] risk factor for poor prognosis." Id.

Dr. Leist testified that Petitioner's MRIs were consistent with HSV encephalitis. Tr. 194-95. He stated that Petitioner's MRI taken the morning of September 24, 2015 demonstrated diffusion brightness, which he interpreted as damage that had already occurred within the central nervous system, manifesting as speech difficulties and right sided weakness which Petitioner

[36] Alejandro A. Rabinstein, Herpes Virus Encephalitis in Adults, 35 Neurol Clin. 695 (2017).

exhibited on September 23, 2015. Tr. 194. He emphasized that Petitioner's MRI was different from Sawtell and Thompson, where only "one cell position in the ganglion" was affected, because Petitioner's MRI showed "local tissue destruction." Id. Dr. Leist testified that the diffusion brightness on the MRI "is not an immediate event" but instead "it takes time" for the tissue destruction to mature. Id. He continued, stating that the second MRI on September 26, 2015 showed involvement on the left side of Petitioner's brain, exemplary of how it takes time for tissue destruction to appear and was not the result of a "second reactivation" as proposed by Dr. Tornatore. Id.

Dr. Leist also disagreed about the relevance of Petitioner's low lymphocyte count. Tr. 191-92. He noted that Petitioner's' lymphocyte count was not tested before vaccination. Tr. 184. The day after vaccination, September 23, her lymphocyte count was 2,200, which was within normal limits. Tr. 189. On September 24, her lymphocyte count was 1,200, which was also normal. Tr. 190. Petitioner's lymphocyte count dropped to 800 on September 25, 2015, three days after her vaccination, and it returned to normal the following day. Tr. 192. Dr. Leist opined that Petitioner had "an isolated low lymphocyte count" on September 26 but he did not attribute the single low count to the flu vaccine. Tr. 193. Nor did he attribute the single low lymphocyte count as an indication that Petitioner was immunosuppressed or immunocompromised but stressed that Petitioner had received medication for a stroke and other interventions that may have affected her lymphocyte count on September 26. Tr. 198-99.

Also relevant to Althen prong two are the treating physician opinions. Dr. Leist acknowledged that some physicians noted a temporal association between the flu vaccination and onset of Petitioner's symptoms, but these notes did not state that the flu vaccine was the cause of her symptoms or condition. Tr. 199. Petitioner's CSF was positive for HSV. Resp. Ex. A at 2; see also Pet. Ex. 6 at 62. Dr. Leist observed that the discharge summary from Baylor University Medical Center from November 12, 2015 stated "[Petitioner's] HSV PCR from outside hospital came back positive, and therefore, it was confirmed that this patient had a viral encephalitis causing her symptoms." Tr. 200 (quoting Pet. Ex. 3 at 7800). Dr. Leist testified that the treating physicians considered the flu vaccine as a possible cause of her condition, but once her PCR results confirmed HSV, Petitioner's diagnosis was herpes encephalitis caused by HSV. Id.

Petitioner was started on acyclovir on September 26, 2015, although Dr. Leist opined that it could have been started sooner based on her initial MRI. Tr. 197. Additionally, given the MRI results, he would have "probably expanded the treatment options." Id.

In conclusion, Dr. Leist maintained that Petitioner's HSV reactivation likely began prior to the flu vaccine she received on September 22, 2015, and his opinion in this regard is supported by Petitioner's timeline of symptoms and MRI results. Tr. 202. Further, her condition was consistent with the clinical course of HSV encephalitis, and it was not significantly aggravated by the flu vaccination. Id.

**iii. Loving Prong Six/Althen Prong Three**

Dr. Leist disagreed with Dr. Tornatore that a one-day onset of HSV encephalitis was an appropriate timeframe to infer vaccine causation. Resp. Ex. A at 6. Petitioner began

demonstrating neurological symptoms of HSV encephalitis one day after she received the flu vaccine on September 22, 2015, and that the time course supports the opinion that Petitioner's reactivation of HSV "occurred prior to the administration of the [flu] vaccine." Id.

Petitioner received her flu vaccine in the afternoon of September 22, 2015, at approximately 3:00 p.m. See Pet. Ex. 1 at 1; Pet. Ex. 6 at 7. Ambulance records state that Petitioner did not feel well at 6:00 a.m. on the morning of September 23, she had a headache around 11:00 a.m., and so she took an Advil and a nap. Pet. Ex. 3 at 7630. Approximately 2:00 p.m., she woke up, "took a shower, [and] didn't have the coordination to turn the knobs in the shower." Id. Hospital records stated Petitioner had right-sided weakness and speech problems that began around noon. Tr. 187 (citing Pet. Ex. 6 at 7). Based on this chronology, Dr. Leist opined that Petitioner's symptoms related to onset evolved beginning around 6:00 a.m., with the "latest point of onset" around 11:00 a.m. on September 23. Tr. 185-88.

Referring to Sekizawa and Openshaw, Dr. Leist opined that the minimal biologically plausible time interval for reactivation of HSV following administration of a "potent inducer" is seven days. Resp. Ex. A at 6; see Resp. Ex. F at 2; Tr. 175. He disagreed with Dr. Tornatore that HSV replication could result in infection and neurological symptoms within 24 hours. Tr. 171. Dr. Leist, disagreeing with Dr. Tornatore's interpretation of Sawtell and Thompson, argued that the article only showed limited viral replication after 14 hours and such replication was limited to the ganglion. Tr. 172 (citing Pet. Ex. 28 at 1). Dr. Leist testified that if the source of the virus was the ganglion, then it would need more than 14 hours to be transported to the CNS, and cause tissue destruction leading to symptoms. Tr. 172-73. Further, Dr. Leist asserted that the timeframes in the animal studies are different from the human body. Tr. 173. He explained that in Sawtell and Thompson, the researchers raised the temperature of the mice (hyperthermia), which is different from a fever. Id. He testified that a fever is created by a cellular response by a host responding to pathogens, whereas in Sawtell and Thompson, the mice were bathed in 44º Celsius water to induce hyperthermia. Id. But most notable to Dr. Leist about the Sawtell and Thompson study was that there was no spread to other cells. Id.

Referencing the Halford et al. article, Dr. Leist testified that the *in vitro* model, which differed from the Sawtell and Thompson experiment, identified "infectious HSV" viral replication after five days, but they also found that HSV mRNA was detectable after 24 hours. Tr. 176; see also Resp. Ex. C at 8. Dr. Leist testified that the article shows 24 hours after heat stress the HSV viral replication is just beginning. Tr. 176. Dr. Leist argued that "[n]one of the articles . . . speak[] to the point that herpes encephalitis can be induced within less than 24 hours or within less than 48 hours, so from that point of view, they are purely looking at reactivation of virus." Tr. 177-78.

Dr. Leist concluded that the onset of Petitioner's symptoms of HSV encephalitis began 15-18 hours after administration of the flu vaccine, when she developed symptoms of illness on the morning after vaccination, and thus it was likely that her HSV reactivation began prior to administration of the September 22, 2015 flu vaccine. Resp. Ex. G at 1; Tr. 203.

## III. DISCUSSION

### A. Standard of Adjudication—Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). But see Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejecting the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 538 (2011) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." (quoting Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991), aff'd per curiam, 968 F.2d 1226 (Fed. Cir. 1992))), recons. den'd after remand, 105 Fed. Cl. 353 (2012), aff'd mem., 503 F. App'x 952 (Fed. Cir. 2013).

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Despite the weight afforded to medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. Valenzuela v. Sec'y of Health & Hum. Servs., No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); see also Eng v. Sec'y of Health & Hum. Servs., No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) ("[Section 13(b)(2)] must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them." (emphasis omitted)).

### B. Standards for Adjudication—Causation

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as

a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" Rooks v. Sec'y of Health & Hum. Servs., 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, reprinted in 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991). Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

In particular, Petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting Shyface v. Sec'y of Health & Hum. Servs., 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); see also Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1355 (Fed. Cir. 2006). The received vaccine, however, need not be the predominant cause of the injury. Shyface, 165 F.3d at 1351. A petitioner who satisfies this burden is entitled to compensation unless Respondent can prove, by a preponderance of the evidence, that the vaccinee's injury is "due to factors unrelated to the administration of the vaccine." § 13(a)(1)(B). However, if a petitioner fails to establish a prima facie case, the burden does not shift. Bradley, 991 F.2d at 1575.

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case." Flores v. Sec'y of Health & Hum. Servs., 115 Fed. Cl. 157, 162-63, aff'd, 586 F. App'x 588 (Fed. Cir. 2014); see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347, 1353 (Fed. Cir. 2008) ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); Pafford, 451 F.3d at 1358-59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . . [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

To receive compensation through the Program, Petitioner must prove either (1) that she suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that she received, or (2) that she suffered an injury that was actually caused by or significantly aggravated by a vaccination. See §§ 11(c)(1), 13(a)(1)(A); Capizzano, 440 F.3d at

1319-20. Because Petitioner does not allege she suffered a Table Injury, she must prove her flu vaccine significantly aggravated her injury. See Loving, 86 Fed. Cl. at 142-44.

The causation theory must relate to the injury alleged. Petitioner must provide a sound and reliable medical or scientific explanation that pertains specifically to this case, although the explanation need only be "legally probable, not medically or scientifically certain." Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner cannot establish entitlement to compensation based solely on her assertions; rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor. § 13(a)(1). In determining whether Petitioner is entitled to compensation, the special master shall consider all materials in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding . . . causation." § 13(b)(1)(A). The undersigned must weigh the submitted evidence and the testimony of the parties' proffered experts and rule in Petitioner's favor when the evidence weighs in her favor. See Moberly, 592 F.3d at 1325-26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence."); Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1280 (Fed. Cir. 2005) (noting that "close calls" are resolved in Petitioner's favor).

Testimony that merely expresses the possibility—not the probability—is insufficient, by itself, to substantiate a claim that such an injury occurred. See Waterman v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. 564, 573-74 (2015) (denying Petitioner's motion for review and noting that a possible causal link was not sufficient to meet the preponderance standard). The Federal Circuit has made clear that the mere possibility of a link between a vaccination and a petitioner's injury is not sufficient to satisfy the preponderance standard. Moberly, 592 F.3d at 1322 (emphasizing that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury" does not equate to proof of causation by a preponderance of the evidence); Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1359-60 (Fed. Cir. 2019). While certainty is by no means required, a possible mechanism does not rise to the level of preponderance. Moberly, 592 F.3d at 1322; see also de Bazan, 539 F.3d at 1351.

### C. Standards for Adjudication—Significant Aggravation

The elements of an off-Table significant aggravation case are set forth in Loving. See Loving, 86 Fed. Cl. at 142-44; see also W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d 1352, 1357 (Fed. Cir. 2013) (holding that "the Loving case provides the correct framework for evaluating off-table significant aggravation claims"). The Loving court combined the Althen test, which defines off-Table causation cases, with a test from Whitecotton. Whitecotton v. Sec'y of Health & Hum. Servs., 17 F.3d 374 (Fed. Cir. 1994), rev'd sub nom., Shalala v. Whitecotton, 514 U.S. 268 (1995) (concerning on-Table significant aggravation cases). The resultant test has six components, which are:

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a 'significant aggravation' of the person's condition prior to vaccination, (4) a medical theory

> causally connecting such a significant worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

Loving, 86 Fed. Cl. at 144.

The statute defines "significant aggravation" as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration in health." § 33(4).

## IV. SIGNIFICANT AGGRAVATION ANALYSIS

### A. Loving Factor One: Petitioner's Condition Prior to the Vaccination

The first step in the Loving test is to determine Petitioner's condition prior to the administration of her flu vaccine on September 22, 2015.

The parties stipulated that Petitioner had acquired herpes simplex some point prior to the flu vaccination on September 22, 2015. Joint Submission at 1. Similarly, both experts agree that Petitioner was not demonstrating any signs or symptoms consistent with herpes reactivation or HSV encephalitis prior to the receipt of the flu vaccine. See Tr. 83, 129, 184.

The undersigned agrees with the parties that Petitioner had acquired HSV prior to administration of the flu vaccination. As the medical literature explains, HSV remains latent in the nerves after a primary infection and can become reactivated at times. See, e.g., Resp. Ex. K at 1-2; Pet. Ex. 19 at 1. HSV-1 seropositivity is between 60% to 90% among older adults. Resp. Ex. K at 1.

Therefore, the undersigned finds that Petitioner had acquired HSV prior to the administration of her flu vaccination and was not demonstrating any neurological symptoms associated with HSV encephalitis prior to her flu vaccination on September 22, 2015.

### B. Loving Factor Two: What is Petitioner's Current Condition (or Her Condition Following the Vaccination, If Also Pertinent)?

The second part of the Loving test is to determine the Petitioner's condition following the flu vaccination. Loving, 86 Fed. Cl. at 144.

Petitioner's daughter's testimony, medical records, and expert testimony demonstrate that Petitioner began to experience symptoms attributable to HSV encephalitis within 24 hours of vaccination, by 11:00 a.m. to 12:00 p.m. on September 23. See Tr. 19; Pet. Ex. 6 at 7 ("Chief complaint: Right-sided weakness, speech difficulty, beginning about noon."). A brain MRI taken on September 24, 2015 demonstrated "diffusion restriction consistent with recent ischemia involving the left insular and left posterior frontal cortex," with "associated edema-like signal," evidence of ongoing tissue injury. Pet. Ex. 6 at 80. While Petitioner was initially hospitalized at

MCMC, she continued to deteriorate and demonstrate symptoms consistent with HSV encephalitis. Id. at 24-25, 27. A repeat MRI taken on September 26, 2015 showed "diffusion restriction in the bilateral superior frontal gyri," and the diffusion restriction seen earlier in the posterior/lateral of the frontal lobe and left insula, with very mild associated leptomeningeal enhancement" was redemonstrated. Id. at 86. The lumbar puncture was positive for herpes simplex virus DNA and Petitioner was later started on acyclovir. Id. at 13-14, 62.

Petitioner was transferred to Baylor University Medical Center, where she was treated with five-weeks of acyclovir. Pet. Ex. 3 at 7802. During her hospitalization, Petitioner was diagnosed with HSV encephalitis and had a very difficult clinical course. Id. at 7800-02.

Petitioner was unable to live independently after her diagnosis and hospitalization, having to live to in multiple rehabilitation facilities. Tr. 11-15. Her cognitive decline was significant as demonstrated by her records and the testimony of her daughter. See Pet. Ex. 4; Tr. 11.

The undersigned finds that Petitioner began to experience neurological symptoms consistent with HSV encephalitis within 24 hours of receiving her flu vaccination. The medical records clearly establish that Petitioner suffered from HSV encephalitis. There is also evidence that Petitioner's condition had a severe impact on her life and that she is unable to live independently since the diagnosis of HSV encephalitis.

### C. Loving Factor Three: Does Petitioner's Current Condition (or Condition after Vaccination) Constitute a "Significant Aggravation" of Her Condition Prior to Vaccination?

The next factor of the Loving test is to determine whether there is a "significant aggravation" of Petitioner's condition by comparing his condition before vaccination to his condition after vaccination. The statute defines "significant aggravation" as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration in health." § 33(4). Loving factor three "only requires a comparison of a petitioner's current, post-vaccination condition with her pre-vaccination condition." Sharpe v. Sec'y of Health & Hum. Servs., 964 F.3d 1072, 1082 (Fed. Cir. 2020). Additionally, Petitioner is not required to demonstrate that her post-vaccination condition is worse than the expected outcome of the disease to demonstrate Loving prong three. Id.

As Loving prong three only requires a comparison of a petitioner's pre-and-post-vaccination condition, the undersigned finds, based on the facts, medical literature, and opinions of the experts, that Petitioner suffered a significant aggravation or worsening of her pre-vaccination condition characterized by "markedly greater disability, pain, . . . [and a] substantial deterioration in health," and she was diagnosed with HSV encephalitis. § 33(4). This finding indicates that while Petitioner may have technically suffered a significant aggravation within in the language of the Vaccine Act, whether the flu vaccination actually caused Petitioner's HSV encephalitis is discussed in Loving factor four/Althen prong one.

### D. Loving Factor Four/Althen Prong One: Medical Theory of Causation

The fourth Loving factor has its origins in Althen prong one, and Petitioner must set forth a medical theory explaining how the received vaccine could have caused the sustained injury. Andreu, 569 F.3d at 1379; Pafford, 451 F.3d at 1355-56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. Boatmon, 941 F.3d at 1359; see also Knudsen, 35 F.3d at 548; Veryzer v. Sec'y of Health & Hum. Servs., 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"). If Petitioner relies upon a medical opinion to support her theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. See Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339 at 1347 (Fed. Cir. 2010) ("The special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories."); Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing Fehrs v. United States, 620 F.2d 255, 265 (Ct. Cl. 1980))).

The undersigned finds Petitioner failed to provide preponderant evidence of a sound and reliable theory to explain how the flu vaccine can cause or significantly aggravate pre-existing replicating HSV or cause HSV encephalitis within one day of vaccination. There are several reasons for this finding.

Dr. Tornatore opined that the flu vaccine could cause HSV encephalitis by causing lymphopenia, leading to a loss of immune surveillance, allowing latent HSV to rapidly reactivate, leading to HSV encephalitis within 24 hours. See Tr. 66-67, 77-78, 90; Pet. Ex. 8 at 10. He proposed this mechanism for both how the flu vaccine could cause latent HSV to reactivate rapidly, leading to encephalitis and, in the alternative, if asymptomatic HSV replication had been occurring at the time of the vaccination, rapidly leading to encephalitis. Tr. 101-03.

With respect to how the flu vaccine could affect already replicating HSV, Dr. Tornatore was unable to render his opinion beyond a possibility. See Tr. 66-67, 84, 102-03. He testified,

> Is it possible that on the day that [Petitioner] got the vaccine . . . is it possible that there was a little bit of virus that had already multiplied in the trigeminal nerve and maybe a teeny little bit had gotten into the nervous system as suggested by both the Bradshaw [and Venkatesan] and Hassman [and DiLoreto] article[s], but it's very small? That's possible. . . . So [it is] possible that [Petitioner] had a teeny little bit of virus that was already there in the brain, didn't rise to the level of encephalitis, but then she gets vaccinated and now you lose immune control, and then . . . the virus can replicate.

Tr. 66-67. He stated that he would "not call that a significant aggravation," because "it's not that [the flu vaccine] aggravated the situation, but it allowed the virus to escape." Tr. 67. Dr. Tornatore then testified that he "[did not] know if we would call it a significant aggravation," but

instead a "significant impetus that would allow the virus to multiply." Tr. 84. But when he was asked to provide his opinion as to whether the Petitioner had HSV replication in her brain at the time of vaccination, Dr. Tornatore testified, "I can say that it's a possibility, but beyond that, I don't think we can say that, because she was asymptomatic." Tr. 102. Dr. Tornatore testified that it was "speculative" that Petitioner had HSV in the brain at the time of vaccination, and that "what is more probable is that there was latent virus that escaped surveillance following the vaccination and led to encephalitis." Tr. 112.

Given that Dr. Tornatore was unable to render his opinion that Petitioner's HSV had replicated into her central nervous system and/or was replicating at the time of vaccination beyond a possibility, the undersigned finds that Dr. Tornatore's opinion regarding how the flu vaccine could cause a significant aggravation is not supported by preponderant evidence. Opinions based on possibilities are insufficient to prove causation. See Waterman, 123 Fed. Cl. at 573-74; Moberly, 592 F.3d at 1322 (emphasizing that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury" does not equate to proof of causation by preponderance of the evidence").

Therefore, Petitioner may only pursue Dr. Tornatore's second scenario, that the flu vaccine caused latent HSV to reactivate after vaccination, leading to HSV encephalitis. See Tr. 112 ("However, what is more probable is that there was latent virus that escaped surveillance following the vaccination and led to encephalitis.").

Similar to the above, the undersigned finds that Dr. Tornatore's mechanism for how the flu vaccine could cause a reactivation of latent HSV, by induing lymphopenia and leading to encephalitis within 24 hours of vaccination is also unsupported by preponderant evidence.

Fundamental to Dr. Tornatore's causal theory is that the flu vaccine can cause lymphopenia. He relied on Cummins et al., which studied the white blood cell count of adults over the age of 65 after receiving the flu vaccine, and found that the overall total white blood cell counts and lymphocyte counts were significantly lower after vaccination. Pet. Ex. 26 at 2; see also Tr. 64-65. Dr. Leist concluded that Cummins et al. did not provide reliable evidence that the flu vaccine can cause lymphopenia because the study only showed lymphocyte changes at two and four weeks post-vaccination, but not closer in time to vaccination. Tr. 169-70. Additionally, he stated that the authors characterized lymphocyte changes as modest, and were unable to attribute the changes in lymphocytes to the vaccine due to a viral infection prevalent in the community at the time of the study. Tr. 169 (citing Pet. Ex. 26 at 3 ("That the effect of the lymphocyte count was related to the vaccine rather than a viral infection prevalent locally at the time of our study is not possible to establish.")). The undersigned finds Dr. Leist's conclusions about the Cummins et al. study more persuasive, as they are more consistent with the findings reported by the authors. The authors did not reach a conclusion about what caused lymphopenia, and the authors did not attach significance to the decrease in lymphocytes, stating, "The overall magnitude of this change was small and unlikely to be of important clinical significance." Pet. Ex. 26 at 3. Thus, the undersigned finds that the article does not provide foundational evidence underpinning Dr. Tornatore's theory that the vaccine caused lymphopenia.

The other article Dr. Tornatore relied on to support his opinion that the flu vaccine can cause lymphopenia was the case report provided by Hassman and DiLoreto, where the patient developed three episodes of HSV central nervous system events after receiving three consecutive flu vaccines and was found to have low lymphocyte levels at the time of the central nervous system events. See Pet. Ex. 25 at 4; Tr. 46. Dr. Leist did not agree that Hassman and DiLoreto supported Dr. Tornatore's theory that the flu vaccine induces lymphopenia leading to HSV encephalitis. Tr. 163. Dr. Leist noted that the authors of Hassman and DiLoreto observed that the patient had low lymphocyte counts throughout the hospitalization. Tr. 163-64 (citing Pet. Ex. 25 at 1 ("His absolute lymphocyte counts were consistently low throughout his hospitalization, between 400 and 800 mm (normal range 1300-3600).")). Further, Dr. Leist observed that the patient in the Hassman and DiLoreto case report suffered his first HSV central nervous system event 10 days after receiving the flu vaccine, not one day later, and the second event, occurring only three days after the flu vaccine, was considered to be sequalae of his earlier episode of HSV encephalitis. Tr. 161.

Hassman and DiLoreto did not conclude that the flu vaccine caused the patient's lymphopenia, leading to episodes of HSV reactivation, but instead reported that "there were likely multiple host and viral factors that contributed to [their] patient's disease." Pet. Ex. 25 at 4. Further, they noted that their patient had fewer circulating CD-4 T cells, suggesting that a "subtle immunologic deficiency in [their] patient may have lowered the threshold for clinically significant HSV reactivation in the [central nervous system]," which may have played a role, or the vaccine "tipped" the balance, allowing viral replication to proceed. Id. Dr. Leist was also correct in observing that the time between the vaccination and the first HSV central nervous system event described in Hassman and DiLoreto is inconsistent with the timeframe Dr. Tornatore is suggesting lymphopenia can be induced by the flu vaccine.

Moreover, while case reports merit some evidentiary weight, they do not constitute strong supportive evidence of vaccine causation, and alone cannot meet the preponderance evidence standard. See Campbell v. Sec'y of Health & Hum. Servs., 97 Fed. Cl. 650, 668 (2011); Caves v. Sec'y of Health & Hum. Servs., No. 07-443V, 2010 WL 5557542, at *14 (Fed. Cl. Spec. Mstr. Nov. 29, 2010) (finding a petitioner's "reference to case reports [did] not help her meet her burden of demonstrating a persuasive and reliable theory causally connecting the [] vaccine to [the injury]"), mot. for review den'd, 100 Fed. Cl. 119 (2011), aff'd, 463 F. App'x 932 (Fed. Cir. 2012); Muchnick ex rel. Muchnick v. Sec'y of Health & Hum. Servs., No. 90-703V, 1991 WL 217673, at *4 (Fed. Cl. Spec. Mstr. Oct. 10, 1991) ("For the petitioner to establish causation in fact by a preponderance of the evidence in any given case requires something more than case reports . . . ."). The undersigned finds that the Hassman and DiLoreto case report describes a patient having low lymphocyte levels during HSV central nervous system events, but the causes for the decreased lymphocyte counts were undetermined by the authors and the factual differences in the case described make it difficult to reach the conclusion that the vaccine can cause lymphopenia one day after vaccination, leading to an HSV central nervous system event.

In summary, the undersigned finds there is not preponderant foundational evidence to support Dr. Tornatore's position that the flu vaccine can cause lymphopenia. Therefore, Dr. Tornatore is unable to support his theory based on vaccine-induced lymphopenia.

Next, Dr. Tornatore opined that the flu vaccine induced dysfunction of the lymphocytes that normally regulate HSV. See Tr. 51 (testifying "the [flu] vaccination caused lymphopenia . . . and more importantly, probably it wasn't just the absolute number, but clearly it had an impact on the physiology of those cells"); Tr. 101-02 ("So the vaccine, it caused lymphopenia. However, it also caused a change in lymphocyte physiology and activity."). It was the impact on "lymphocyte physiology" that caused a loss of immune regulation, allowing the virus to escape surveillance and gain access to the central nervous system, replicate and cause encephalitis. Tr. 90. Dr. Tornatore also noted that the Hassman and DiLoreto article suggested that the flu vaccine had some type of toxic effect by secreting cytokines or chemokines, causing a decrease in lymphocytes. Tr. 56 (citing Pet. Ex. 25 at 4). He also cited Oh et al. and suggested that immunosenescence caused exhausted T-cells and the flu vaccine, caused a production of chemokines that further exhaust T-cells, causing the lymphocytes to die off, allowing the herpes virus to replicate and multiply. Tr. 58-60, 64. Dr. Leist testified that Oh et al. provides an overview of immunosenescence, but it also suggests strategies for overcoming "less responsive immune systems" that would be incompatible with Dr. Tornatore's theory. Tr. 180-81. Dr. Leist observed that Oh et al. described vaccine strategies to make them more effective for older adults, including increasing the number of antigens in flu vaccines or number of vaccinations, and if Dr. Tornatore's theory was true, "it would potentially be a lethal blow for immune cells." Tr. 181.

The undersigned finds this aspect of Dr. Tornatore's theory for how the flu vaccine could cause HSV reactivation was not supported by preponderant evidence. Dr. Tornatore testified that he was "speculating" about this aspect of the theory. Tr. 60 ("And so, again, I'm speculating . . . we don't know the answer."). Thus, this theory also does not reach the level of preponderance requires as it is based on speculation and possibility, and therefore unreliable. See Kreizenbeck v. Sec'y of Health & Hum. Servs., No. 08-209V, 2018 WL 3679843, at *31 (Fed. Cl. Spec. Mstr. June 22, 2018) (explaining that when evaluating whether petitioners have carried their burden of proof, special masters consistently reject "conclusory expert statements that are not themselves backed up with reliable scientific support"), mot. for rev. denied, decision aff'd, 141 Fed. Cl. 138, aff'd, 945 F.3d 1362 (Fed. Cir. 2020); Prokopeas v. Sec'y of Health & Hum. Servs., No. 04-1717V, 2019 WL 2509626, at *19 (Fed. Cl. Spec. Mstr. May 24, 2019) (finding "opinion evidence that is connected to existing data only by the ipse dixit of the expert" unreliable (quoting Moberly, 592 F.3d at 1315)).

Dr. Tornatore, referencing Hassman and DiLoreto, also suggested that the flu vaccine could have distracted the normal immunologic surveillance of HSV, because the T-cells normally near infected neurons responded to the site of vaccination instead, which allowed HSV to replicate unchecked. Tr. 56-57 (citing Pet. Ex. 25 at 4). However, Dr. Tornatore conceded that science does not "have a good handle" on the causes of HSV reactivation, agreeing "[w]e don't have a good answer as to why it happens, but it happens." Id. Accordingly, the undersigned finds this theory unsupported by preponderant evidence.

Lastly, none of the theories advanced by Dr. Tornatore explain how the flu vaccination would result in rapid replication of the herpes virus such that encephalitis would occur within one day. Dr. Tornatore focused on immunosenescence. He opined that older adults with latent HSV in the trigeminal ganglia, as a result of rapid lymphopenia and in the presence of immunosenescence, would allow HSV to replicate more quickly resulting in a rapid onset of

HSV. Tr. 68, 89. Referring to Oh et al., Dr. Tornatore opined that older adults' immune systems have a decreased response to vaccines and increased susceptibility to infectious agents. Tr. 63. Oh et al. explained that the mechanisms for both VZV reactivation and Cytomegalovirus ("CMV") (a herpesvirus) reactivation are unclear. Pet. Ex. 27 at 10. Notably the authors explain that "CMV has developed various immune evasion strategies to modulate host immune activation during lytic and latent infections," and the persistence has a profound effect on alterations in adaptive immunity, particularly T-cell composition and function. Id. However, the authors did not attribute reactivation of either VZV or CMV to vaccinations. Therefore, Dr. Tornatore's opinion regarding the flu vaccine rapidly reactivating a latent HSV in the presence of immunosenesence is not supported by Oh et al.

He also referred to Sawtell and Thompson, who examined HSV reactivation in mice and found replicating virus in the trigeminal ganglia 14 hours after heat stress was induced. Tr. 69-70; Pet. Ex. 28 at 4. However, Sawtell and Thompson only found viral replication in the ganglionic neurons and the number of affected neurons was relatively low. Pet. Ex. 28 at 4-5. Dr. Tornatore conceded that the neuronal damage occurred in the trigeminal ganglia and that the mice did not develop HSV encephalitis within 14 hours, but argued that the study only showed how HSV can spread in immunocompetent hosts, and that it was "not a model to look at how virus can spread in immunoincompetent." Tr. 122-23. Dr. Tornatore opined that Petitioner was immunosenescencent or susceptible to vaccine complications, he did not characterize her as "immunocompromised." Tr. 123.

The Halford et al. article, referenced by Dr. Leist, provides additional evidence that HSV cannot reactivate within 24 hours sufficient to cause encephalitis. See Resp. Ex. C. Dr. Leist explained that Halford et al. found that after 24 hours, HSV replicated, however, it was still largely undetected in culture until 48 hours after heat stress. Tr. 177. He testified that Halford et al. shows that HSV can replicate after heat stress, but it does not show that herpes encephalitis can be induced within less than 24 hours or within less than 48 hours. Id.

Although a petitioner need not make a specific type of evidential showing (i.e., epidemiologic studies) to satisfy her burden, special masters shall still consider and weigh the evidence in the record, including the epidemiological studies filed. See § 13(b)(1) (indicating the special master shall consider all materials in the record); Capizzano, 440 F.3d at 1325-26; Grant v. Sec'y of Health & Hum. Servs., 956 F.2d 1144, 1149 (Fed. Cir. 1992) (finding "epidemiological studies are probative medical evidence relevant to causation" and "considerable weight [is] due to epidemiological studies in the absence of direct evidence of actual causation"). And after weighing the submitted evidence, the undersigned finds the evidence does not preponderate in Petitioner's favor. See Moberly, 592 F.3d at 1325-26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence.").

Finally, there are other Program cases with reasoned analyses discussing whether vaccines can cause or exacerbate herpes encephalitis where the special masters have denied entitlement. See, e.g., Niziol ex rel. S.N. v. Sec'y of Health & Hum. Servs., No. 15-1446V, 2020 WL 497306 (Fed. Cl. Spec. Mstr. Apr. 24, 2020) (rejecting the theory the measles-mumps-

rubella ("MMR") vaccine creates a temporary immunosuppressive effect, allowing a herpes infection develop into HSV-1 encephalitis); Doe v. Sec'y of Health & Hum. Servs., No. XX-XXXV, 2010 WL 3154546 (Fed. Cl. Spec. Mstr. July 26, 2010) (finding the theory that "vaccines in general compromise the immune system," that could result in HSV encephalitis unreliable and unsupported by medical opinion and testimony).

In Niziol, the experts opined that the MMR vaccine could cause a temporary immunosuppressive state which could facilitate HSV encephalitis, similar to Dr. Tornatore's theory offered in this matter. Niziol, 2020 WL 4197306, at *21-22. The special master rejected this theory, observing that some evidence submitted by Petitioner also showed that HSV encephalitis occurs in patients without immunosuppression, and that there was no reliable evidence submitted that demonstrated the MMR vaccine caused immunosuppression. Id. at *21. The special master in Doe rejected the petitioner's theory that the vaccines administered could cause a greater susceptibility to the herpes virus, ultimately leading to encephalitis. Doe, 2010 WL 3154546, at *15-17. The special master stated that petitioner's theory was insufficient "to forge the link between the general hypothesis that vaccines weaken the immune system and [the injury of HSV encephalitis]." Id. at 16.

Although decisions of other special masters are not binding, the undersigned finds the above cases instructive and follows the reasoning of her colleagues. See Boatmon, 941 F.3d at 1358; Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999).

Therefore, the undersigned finds there is not preponderant evidence of a causal association between the flu vaccine and reactivation of HSV or HSV encephalitis. Petitioner's theory relies on the flu vaccine inducing lymphopenia, which would adversely affect the ability of the immune system to result in an effect to the immune allow HSV to replicate sufficient enough to cause encephalitis within 24 hours. However, this mechanism is not supported by preponderant evidence, as the medical literature does not preponderantly demonstrate that the flu vaccine induces lymphopenia, or that HSV replicates rapidly and sufficiently enough cause encephalitis within 24 hours.

Overall, the undersigned finds that here, Petitioner's proffered theory does not constitute a sound and reliable causal theory. Thus, the undersigned finds Petitioner has failed to provide preponderant evidence with respect to the Loving factor four and Althen prong one.

### E. Loving Factor Five/Althen Prong Two: Logical Sequence of Cause and Effect

Under Loving factor five and Althen prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." Capizzano, 440 F.3d at 1324 (quoting Althen, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" Pafford, 451 F.3d at 1356 (internal citations omitted).

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting Althen, 418 F.3d at 1280). Medical records are generally viewed as trustworthy evidence, since they are created contemporaneously with the treatment of the vaccinee. Cucuras, 993 F.2d at 1528. Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano, 440 F.3d at 1325. Instead, Petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

Since, Petitioner failed to prove Loving factor four/Althen prong one, it follows that she cannot prove Loving factor five/Althen prong two. However, the undersigned also finds that Petitioner has failed to show by preponderant evidence that there is a logical sequence of cause and effect showing Petitioner's flu vaccine caused or significantly aggravated HSV replication/encephalitis for one additional reason.

There is lack of support by Petitioner's treating physicians associating the flu vaccine with causing Petitioner's HSV encephalitis. Though the flu vaccine was mentioned by Petitioner's treating physicians, it was only in the context of a temporal association and as the possibility of precipitating other conditions.

For example, on September 24, 2015, Dr. Patalay stated "[Petitioner's] symptoms could well be [secondary] to reaction from her recent flu vaccine." Pet. Ex. 6 at 23. Then on September 26, 2015, neurologist Dr. Alexander wrote, "high-grade fever in a patient with stroke. The timing of the flu shot and her symptoms are quite impressive. It certainly could be vaccine induced encephalitis, but that is very rare, however, that does not explain the stroke symptoms." Id. at 14. At the same time though, Dr. Alexander began to consider herpes virus encephalitis, stating, "other possibilities include a viral encephalitis, especially [HSV]." Id. Once her CSF came back positive for HSV while she was being treated at Baylor University Hospital, her diagnosis consistently remained herpes simplex encephalitis. See, e.g., Pet. Ex. 3 at 6723 ("Encephalitis with +HSV PCR on CSF"), 6921 (October 17, 2015 infectious disease progress note indicating "CSF +HSV PCR herpes encephalitis" and noting assessment as"herpes simplex encephalitis"), 7800 ("During her stay here her HSV PCR from outside hospital came back as positive and therefore it was confirmed that this patient had viral encephalitis causing her symptoms.").

Generally, treating physician statements are typically "favored" as treating physicians "are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" Capizzano, 440 F.3d at 1326 (quoting Althen, 418 F.3d at 1280). However, no treating physician's views bind the special master, per se; rather, their views are carefully considered and evaluated. § 13(b)(1); Snyder, 88 Fed. Cl. at 746 n.67. "As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their

suppositions or bases." Welch v. Sec'y of Health & Hum. Servs., No. 18-494V, 2019 WL 3494360, at *8 (Fed. Cl. Spec. Mstr. July 2, 2019).

The statements made by Petitioner's treating physicians were made early in her clinical course and were in the context of the possibility of Petitioner having an autoimmune encephalitis, not HSV encephalitis. Further, Dr. Alexander expressed hesitancy as to the relationship between the flu vaccine and Petitioner's presenting symptoms. Lastly, after Petitioner was diagnosed with HSV encephalitis, as confirmed by her positive HSV PCR, no treating physician associated her condition with the flu vaccine. Therefore, aside from noting a temporal association between Petitioner's presentation and the flu vaccine, these statements are afforded little weight as to determining a logical sequence of cause and effect. See Isaac v. Sec'y of Health & Hum. Servs., No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012) ("A treating physician's recognition of a temporal relationship does not advance the analysis of causation.").

For these reasons, the undersigned finds that Petitioner has failed to provide preponderant evidence of a logical sequence of cause and effect to satisfy his burden under Loving factor five/Althen prong two.

### F. Loving Factor Six/Althen Prong Three: Proximate Temporal Relationship

The last element in the six-part Loving test has origins in Althen prong three. As stated in Loving, this element is "a showing of a proximate temporal relationship between vaccination and the significant aggravation." 86 Fed. Cl. at 144. Althen prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. Althen, 418 F.3d at 1281. A proximate temporal relationship has been equated to mean a "medically acceptable temporal relationship." Id. Petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disease's etiology, it is medically acceptable to infer causation-in-fact." de Bazan, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under Althen prong one). Id.; Koehn v. Sec'y of Health & Hum. Servs., 773 F.3d 1239, 1243 (Fed. Cir. 2014); Shapiro, 101 Fed. Cl. at 542.

Based on the case law cited above, this factor/prong consists of two parts. Petitioner must first establish the time frame within which it is medically acceptable to infer causation. And secondly, she must show that the onset of the worsening or aggravation of her illness occurred during this time frame.

Both parties agree that Petitioner was experiencing neurological symptoms of HSV encephalitis as early as noon on September 23, 2015, less than 24 hours after she received the flu vaccine. See Pet. Ex. 6 at 7-9; Pet. Br. at 27; Resp. Br. at 26. But as Petitioner is unable to prove Loving factor four/Althen prong one, she is unable to show how onset of HSV encephalitis 24 hours post-vaccination is a medically acceptable timeframe.

As explained above, Dr. Tornatore testified that in older adults, who likely already have latent HSV in the trigeminal ganglia, combined with immunosenescence, the onset of encephalitis could be more rapid. Tr. 68. The Oh et al. article noted that the absolute number of CD3, CD4, and CD8 T cells in VZV patients were "significantly lower compared to those in the control," but did not suggest that the decrease in these cells were caused by anything other than age-related changes. Id. And as discussed above, Sawtell and Thompson does not support reactivation and development of encephalitis within 24 hours.

In his expert report, Dr. Tornatore opined that the onset of HSV encephalitis 24 hours after the flu vaccine is a medically appropriate timeframe whether HSV was already replicating or not. Pet. Ex. 17 at 1. During the hearing, he testified that the vaccine caused a quick impact on Petitioner's lymphocytes, and allowed the virus to rapidly replicate, leading to encephalitis. Tr. 89. He relied heavily on the Sawtell and Thompson article, which only demonstrated that the virus can begin to replicate within a 24 hour period in the ganglion neurons, not that it can cause encephalitis within 24 hours after being stimulated. See Pet. Ex. 28 at 4. Further, he relied on the Hassman and DiLoreto case report, where the patient developed neurological symptoms of HSV encephalitis ten days after receiving a flu vaccine, not within one day of vaccination. Pet. Ex. 25 at 1. Dr. Tornatore also relies on the Wei et al. article, a large study that found there was a marginal increase in herpes zoster incidence 15 days post-flu vaccination in patients older than 50 years of age. Pet. Ex. 29 at 3.

Dr. Leist disagreed with Dr. Tornatore, opining that it was more likely than not that Petitioner's HSV was already replicating by the time she received the vaccine and the development of neurological symptoms of HSV encephalitis less than 24 hours after vaccination is too short a period to be attributed to the vaccine. Resp. Ex. A at 5-6; Tr. 171, 178. The Sekizawa and Openshaw article found HSV antigens in brains of mice at seven days after stimulation. Resp. Ex. F at 2. The Halford et al. article found that HSV reactivation occurred after 22 hours of heat stress, but substantially increased between 24 and 48 hours after heat stress stimulation. Resp. Ex. C at 8.

Again, the Sawtell and Thompson, Halford et al., and Sekizawa and Openshaw articles only show the replication of the herpes simplex virus within a short period of time, not the onset encephalitis within a 24-hour period of stimulation. Further, Wei et al. only talks about herpes zoster incidences increasing post-flu vaccination, not incidences of HSV encephalitis or neurological symptoms associated to HSV encephalitis. Finally, the Hassman and DiLoreto case report provides limited support for the possibility of a temporal association between the flu vaccine and HSV encephalitis because the timeframe between the first vaccination and HSV CNS event described is 10 days, when in this case, onset is less than one day. Thus, the undersigned finds that the flu vaccine could not induce HSV encephalitis within 24 hours through either a *de novo* reactivation of HSV or by altering the course of the already replicating HSV.

For all of these reasons, the undersigned finds that Petitioner has failed to provide preponderant evidence satisfying Loving factor six/Althen prong three.

## V. CONCLUSION

The undersigned extends her sympathy to Petitioner and to her family for the pain and suffering and disability Petitioner and her family are experiencing due to her illness.

For the reasons discussed above, the undersigned finds that Petitioner has failed to establish by preponderant evidence that her flu vaccine was the cause-in-fact of her HSV encephalitis or significantly aggravated her pre-existing HSV such that it resulted in HSV encephalitis. Therefore, Petitioner is not entitled to compensation and the petition must be dismissed.

In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master